Sheila FERGUSON, Appellant

v.

Derrick MORTON and Philadelphia Cycle Center, Appellee.

Superior Court of Pennsylvania.

Argued Aug. 21, 2013.
Filed Dec. 26, 2013.
Reargument Denied March 5, 2014.

Daniel J. Siegel, Havertown, for appellant.

Lisa B. Apelian, Philadelphia, for Philadelphia Cycle, appellee.

BEFORE: SHOGAN, J., WECHT, J., and COLVILLE, J.*

OPINION BY WECHT, J.:

Sheila Ferguson challenges the trial court's January 4, 2013 order granting Philadelphia Cycle Center's ("PCC") post-trial motion seeking a new trial. Ferguson contends that the trial court erred in granting a mistrial based upon the misconduct of her counsel while presenting closing argument on behalf of Ferguson. We agree, and we reverse.

The sole issue presented concerns certain inflammatory comments by Ferguson's attorney, Thomas More Holland, during closing arguments that the trial court found were designed to appeal to the jurors' passions and prejudices in an effort to increase any award of damages. The trial court found that Holland's summation in effect sought the imposition of punitive damages, despite the fact that such damages were not properly pleaded or proved during the trial.

The evidence presented to the jury supports the following narrative. On June 5, 2010, Ferguson, who worked as a licensed practical nurse, was struck by a motorcycle as she walked to her vehicle. Notes of Testimony ("N.T."), 7/30/2012, at 75. She sustained various injuries, including a segmental fracture of her tibia[1] and a fracture of her fibula. As well, Ferguson suffered abrasions to her face, elbows, and knees, a "knot" on her head, and headaches, with continuing pain arising from her injuries. *Id.* at 81.

As a consequence of the accident and her injuries, Ferguson filed suit against the above-captioned defendants. Against Derrick Morton, allegedly the operator of the motorcycle at the time of the accident, Ferguson sought damages for negligence.[2]

---

* Retired Senior Judge assigned to the Superior Court.

1. A segmental fracture occurs when a bone is broken in more than one place and a middle segment of the bone breaks free of the others. *See* Trial Deposition of Mark D. Avart, D.O., 7/19/2012, at 18.

2. Morton appeared *pro se* at least for portions of the trial, notwithstanding that a default judgment was entered against him before trial began. *See* Order, 7/19/2012. Morton has not participated in this appeal. Consequently, this facial irregularity and Morton's inter-

Ferguson raised claims against PCC of negligence and negligent entrustment for transferring the motorcycle to Morton without verifying that Morton had valid insurance coverage and a motorcycle classification on his Pennsylvania driver's license.

Ferguson offered expert witness Mark Avart, D.O., a board-certified orthopedic surgeon, to testify regarding Ferguson's injuries and treatment. Dr. Avart testified that, in addition to the above injuries, Ferguson also suffered from post-concussion syndrome after the accident. Trial Deposition of Mark D. Avart, D.O. ("Avart Depo."), 7/19/2012, at 12. The segmental fracture to Ferguson's tibia required surgery and the insertion of a rod to stabilize the bone. *Id.* at 16. Ferguson was hospitalized for twelve days after the accident. N.T., 7/30/2012, at 88–89. Following surgery and a period of non-weight-bearing recovery, Avart Depo. at 26–27, Ferguson required the use of a walker for an additional period of her recuperation, including when she returned to work on August 23, 2010, and at least until September, approximately three months after the accident. N.T., 7/30/2012, at 99, 110–11.

As a consequence of the injuries and surgery, Dr. Avart testified that Ferguson would have "some permanent swelling in that leg, with loss of normal strength and motion, and chronic pain." Avart Depo. at 33. He further testified that Ferguson's symptoms would "worsen with prolonged standing, sitting, walking, driving, lifting, and twisting," and that Ferguson would continue to struggle on "stairs and uneven surfaces, and [she] has to be careful about the leg giving way." *Id.* Dr. Avart further testified that Ferguson's various conditions "were chronic and permanent." *Id.* Before the accident, Ferguson had worked sixty or more hours per week. Dr. Avart

opined that, in the wake of the accident, Ferguson would be able to work, but not more than forty hours per week. *Id.* at 42–43.

Ferguson did not return to work until August 23, 2010. At that time she was able to return to one of the two jobs she had at the time of the accident, but not both. In furtherance of her claims regarding limitations on her ability to work that arose as a consequence of her injuries, she submitted the testimony of Philip Spergel, Ph.D., a rehabilitation psychologist and vocational expert. *See* N.T., 7/30/2012, at 223. Dr. Spergel noted Ferguson's history of working long hours and maintaining more than one job, *id.* at 239, and opined that her work capacity would be diminished permanently as a consequence of her injuries. *Id.* at 242. He further testified that she might be limited to jobs that "do not require a great deal of standing and do not require a great deal of walking and certainly no strenuous activities," important limitations for a licensed practical nurse. *Id.* at 244–45.

Regarding the effect of the injuries on Ferguson's earning potential, Dr. Spergel made calculations based on the following two assumptions:

1. Ferguson had lost approximately twelve hours of work per week at a rate of $27.40 per hour. Because this limitation had applied for two years since the accident (as of the time of trial), this had cost Ferguson approximately $34,232.64.

2. Ferguson, who was thirty-six years old when Dr. Spergel interviewed her, had a vocational life expectancy of twenty-nine to thirty-four years, based on retirement ages of sixty-five or seventy, respectively. Con-

ests generally do not bear on our resolution of the issue before us.

sequently, assuming Ferguson would have continued to work sixty or more hours per week until she attained those ages, her earnings loss would be between $433,900 and $508,759.[3]

*Id.* at 253–54, 273–74. In addition to the above two categories of compensable economic damages, the parties stipulated to the existence of an outstanding Pennsylvania Department of Public Welfare lien in the amount of $14,549.70. *Id.* at 14–15. Consequently, the evidence presented the jury with a range of economic damages as high as $557,541.34, in addition to Ferguson's claim for non-economic damages.

Following the close of evidence, Holland presented his summation to the jury. Holland's closing argument repeatedly was interrupted by counsel for PCC on the basis that Holland was presenting improper matter and seeking to inflame the jury by focusing attention upon the fact that PCC was a corporate rather than individual defendant, and by repeatedly suggesting that PCC was concerned only with profits and not with the safety of the greater community. Although the trial court sustained virtually all of PCC's objections, repeatedly admonished Holland, issued numerous curative instructions to the jury, and ultimately cut Holland's summation short due to Holland's failure to adhere to the court's proscriptions, the court denied PCC's oral motion for a new trial. N.T., 8/1/2012, at 112–13. Finally, the jury retired to deliberate. In response to jury interrogatories, the jury found both PCC and Morton negligent, and concluded that both defendants' negligence caused Ferguson's harm. The jury apportioned liability equally to Morton and PCC, and awarded Ferguson $575,000 in damages. *See* Jury Interrogatories, 8/2/2012.

Thereafter, both parties to this appeal filed post-trial motions. Ferguson objected to various evidentiary rulings, including adverse rulings regarding the admissibility and scope of certain expert evidence, and upon that basis sought a new trial. PCC also sought a new trial on various bases, including that Holland's comments during closing were so improper that they could not be remedied by the court's curative instructions, and that they prejudiced PCC before the jury so severely as to undermine confidence in the award of damages.

■ By order entered January 4, 2013, the trial court granted PCC's request for a new trial because it concluded that the prejudice caused by Holland's closing argument was too great to be cured by appropriate curative jury instructions or otherwise.[4] On January 17, 2013, Ferguson

---

3. Initially, Dr. Spergel testified that he had calculated the upper bound on Ferguson's lifetime lost earnings at $581,994.88. N.T., 7/30/2012, at 254. However, on cross-examination, he neither disputed nor clearly conceded counsel's contention that, based upon Dr. Spergel's own formula, the upper bound was, in fact, $508,759. *Id.* at 273–74. For simplicity's sake, we adopt the lower number, because the modest relative difference between those two numbers has no effect upon our analysis.

4. In the relevant order, which the trial court adapted from a proposed order furnished by PCC, the court crossed out a bullet point that would have denied Ferguson's post-trial motion as moot. Thus, the record is devoid of any ruling addressed to Ferguson's post-trial motion. However, our review of the record indicates that Ferguson's post-trial motion was untimely filed. The jury verdict was entered on August 3, 2012. PCC filed its post-trial motion on August 13, 2012, within the ten days afforded by Pa.R.C.P. 227.1(c). Pursuant to Rule 227.1(c), upon the timely filing of PCC's motion for post-trial relief on August 13, 2012, Ferguson had ten days from that date to file her own post-trial motion. Consequently, Ferguson had until August 23, 2012 to do so. However, her post-trial motion was docketed on August 24, 2012, eleven days

filed a motion for reconsideration. On January 31, 2013, Ferguson filed a timely notice of appeal. Ferguson's motion for reconsideration was denied by operation of law on or about February 3, 2013, at the expiration of the thirty-day time limit to appeal the trial court's grant of a new trial. *See Vietri v. Del. Valley High Sch.*, 63 A.3d 1281, 1286 (Pa.Super.2013) (citing, inter alia, Pa.R.A.P. 1701(b)(3)).[5, 6]

Before this Court, Ferguson raises the following issue:

> Did the trial court abuse its discretion or err as a matter of law by granting a new trial based upon the judge's conclusion that the verdict, as rendered, wrongly included an amount for punitive damages, when:
>
> - [PCC] limited its defense at trial to liability;
> - The jury verdict was consistent with [Ferguson's] claim for economic damages;
> - [PCC] did not offer any evidence or witnesses to dispute the nature or extent of [Ferguson's] injuries;
> - [PCC] did not offer any evidence or witnesses to dispute the nature or extent of [Ferguson's] vocational damages, *i.e.*, [Ferguson's] claim for economic damages; and,
> - The trial court provided appropriate instructions to the jury to cure any claimed error by [Holland] in his closing argument?

Brief for Ferguson at 5.

Our time-honored standard of review of a trial court order granting a new trial is as follows:

> Each review of a challenge to a new trial order must begin with an analysis of the underlying conduct or omission by the trial court that formed the basis for the motion. There is a two-step process that a trial court must follow when responding to a request for new trial. *Morrison [v. Commonwealth, Dep't of*

---

after PCC filed its post-trial motions. The trial court has broad discretion to dismiss an untimely posttrial motion or to overlook its untimeliness. *See Kennel v. Thomas*, 804 A.2d 667, 668–69 (Pa.Super.2002); *cf. Baker v. Scranton Aluminum Mfg. Co.*, 242 Pa.Super. 488, 364 A.2d 377, 378 (1976) (affirming dismissal for untimeliness under local four-day rule for the filing of motion for new trial). In *Millard v. Nagle*, 402 Pa.Super. 376, 587 A.2d 10, 12 (1991), we held that, when untimely post-trial motions are filed within the thirty-day period that the trial court retains jurisdiction over the case, and when the trial court decides those issues without objection by an opposing party, we will treat the subsequent appeal as though the post-trial motions were timely filed for purposes of issue preservation. *Accord Kurtas v. Kurtas*, 521 Pa. 105, 555 A.2d 804, 805–06 (1989); *Carr v. Downing*, 388 Pa.Super. 195, 565 A.2d 181, 181–82 (1989). In this case, it appears that PCC did not protest the untimeliness of Ferguson's post-trial motions. However, the trial court never specifically addressed Ferguson's post-trial motion, either on the merits or by noting its untimeliness. Consequently, the conditions noted in *Millard* are not satisfied. Moreover, Ferguson has declined to ask us to grant the relief requested in her post-trial motions. Rather than seek a new trial, as she did in her post-trial motion, before this Court she opposes the new trial ordered by the trial court. Accordingly, any issues Ferguson might have sought to pursue that were raised in her post-trial motion in furtherance of a new trial (had the motion been timely filed) are waived.

5. On April 16, 2013, the trial court entered an order purporting to deny Ferguson's motion for reconsideration as moot in light of Ferguson's notice of appeal. This order was moot because the thirty-day time limit to file an appeal had already run when the trial court entered it. *See* Pa.R.A.P. 1701(b)(3).

6. The trial court did not order Ferguson to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). The court filed an opinion pursuant to Rule 1925(a) on February 4, 2013, which was materially identical to its January 4, 2013 Order and Opinion granting a new trial.

*Pub. Welfare,* 538 Pa. 122], 646 A.2d [565], 571 [ (1994) ]; *see Riccio v. Amer. Republic Ins. Co.,* 550 Pa. 254, 705 A.2d 422, 426 (1997). First, the trial court must decide whether one or more mistakes occurred at trial. These mistakes might involve factual, legal, or discretionary matters. Second, if the trial court concludes that a mistake (or mistakes) occurred, it must determine whether the mistake was a sufficient basis for granting a new trial. *See Spang [& Co. v. U.S. Steel Corp.,* 519 Pa. 14], 545 A.2d [861], 868 [ (1988) ]. The harmless error doctrine underlies every decision to grant or deny a new trial. A new trial is not warranted merely because some irregularity occurred during the trial or another trial judge would have ruled differently; the moving party must demonstrate to the trial court that he or she has suffered prejudice from the mistake. *See Stewart v. Motts,* 539 Pa. 596, 654 A.2d 535, 540 (1995); *Commonwealth v. Faulkner,* 528 Pa. 57, 595 A.2d 28, 39 (1991); *Commonwealth v. Ryder,* 467 Pa. 484, 359 A.2d 379, 382 (1976).

To review the two-step process of the trial court for granting or denying a new trial, the appellate court must also undertake a dual-pronged analysis. *Morrison,* 646 A.2d at 571. A review of a denial of a new trial requires the same analysis as a review of a grant. *Thompson v. City of Philadelphia,* 507 Pa. 592, 493 A.2d 669, 673 (1985). First, the appellate court must examine the decision of the trial court that a mistake occurred.

\*       \*       \*

If the mistake involved a discretionary act, the appellate court will review for an abuse of discretion. *See Commonwealth v. Widmer,* 560 Pa. 308, 744 A.2d 745, 753 (2000) (decision whether verdict is against weight of evidence is discretionary). If the mistake concerned an error of law, the court will scrutinize for legal error. *See Morrison,* 646 A.2d at 571 n. 8 (propriety of jury instructions entails question of law).

\*       \*       \*

If the appellate court agrees with the determination of the trial court that a mistake occurred, it proceeds to the second level of analysis. The appellate court must then determine whether the trial court abused its discretion in ruling on the request for a new trial. *Morrison,* 646 A.2d at 571. "Discretion must be exercised on the foundation of reason." *Coker [v. S.M. Flickinger Co., Inc.,* 533 Pa. 441], 625 A.2d [1181], 1184 [ (1993) ] (quoting P.L.E. New Trial § 2). An abuse of discretion exists when the trial court has rendered a judgment that is manifestly unreasonable, arbitrary, or capricious, has failed to apply the law, or was motivated by partiality, prejudice, bias, or ill will. *Id.* at 1184–85. A finding by an appellate court that it would have reached a different result than the trial court does not constitute a finding of an abuse of discretion. *Morrison,* 646 A.2d at 571. "Where the record adequately supports the trial court's reasons and factual basis, the court did not abuse its discretion." *Id.* (quoting *Coker,* 625 A.2d at 1187).

*Harman v. Borah,* 562 Pa. 455, 756 A.2d 1116, 1122–23 (2000) (some citations omitted, others modified). The error that Ferguson contends requires reversal manifestly concerns the trial court's exercise of discretion in awarding a new trial. Consequently, we must evaluate the trial court's exercise of discretion in so ruling, based not upon how this Court or another might have ruled based upon the same factual and procedural circumstances, but rather

based upon whether the record adequately supported the trial court's reasons for awarding a new trial.

We begin by excerpting the most problematic argument and objections, as well as the curative instructions given by the court to the jury:

MR. HOLLAND: Compare the level of care which each defendant has demonstrated to the level of care that they were using at their store. Compare how loosely they followed the rules of safety for the pursuit of profits and how meticulously they followed the pursuit of these profits.

[RYAN COHEN for PCC]: Objection, Your Honor.

MR. HOLLAND: And corporate—

THE COURT: Whoa, whoa whoa. If there's an objection, please don't roll over it.

The objection is overruled.

Ladies and gentlemen of the jury, this argument goes to what happened factually at the location. There's no claim presented here about punishing them for corporate greed or anything like that. So don't consider this argument as having anything to do with that.

Proceed.

MR. HOLLAND: It has to do with corporate defendants keeping its eye on the ball that's important to them [sic]. That's the pursuit of profit rather than the safety of the community. That's what it has to do with. They try to protect their money. If they had—

MR. COHEN: Objection, Your Honor.

THE COURT: Objection sustained.

Mr. Holland, you're not to imply that this jury has any right to award for punishment of the defendant for corporate greed or corporate profits. There is no punitive [damages] claim.

Proceed.

MR. HOLLAND: If they had been a tad bit careful back at the store, they never would have hurt [Ferguson]. In essence, they are here carefully protecting their right to needlessly endanger the public. Please tell them that in our community the safety of people is more important than safety of money [sic]. The problem is—

MR. COHEN: Objection, Your Honor.

THE COURT: Ladies and gentlemen, again, there is no claim to punish the defendant.

Do you have any other argument to make that does not imply a veiled obligation or invitation to punish the defendant?

MR. HOLLAND: Yes, Your Honor.

THE COURT: Proceed.

MR. HOLLAND: The problem is that they don't put much value on human being [sic] and safety. You saw it for yourself.

MR. COHEN: Objection, Your Honor.

THE COURT: Mr. Holland, if you continue arguing punitive damages no matter how veiled, I will declare your argument finished. .

Proceed.

MR. HOLLAND: Ladies and gentlemen, if I told you that this was the most historic, monumental, serious case that has ever been tried in this courtroom house [sic], I would not be truthful. This is an average case, the kind tried every day in courthouses throughout our country. So why should we care? Because if a verdict is not entered for the plaintiff against both defendants, this defendant will get a pass. And do you think this will happen again? Do you

think that the default setting [7] will be turned on?

MR. COHEN: Objection, Your Honor.

THE COURT: Objection sustained.

Mr. Holland, your argument is finished.

Notes of Testimony, 8/1/2012, at 90–93.

Following PCC's closing and Holland's rebuttal, the attorneys convened at sidebar to address new objections. While at sidebar, counsel for PCC requested a mistrial, based upon "the cumulative effect of the presentation of the plaintiff's closing and the constant need to object, as well as all of the extraneous matters that have now been brought to the attention of the jury." N.T., 8/1/2012, at 112–13. The trial court denied PCC's motion. *Id.* Following deliberations, the jury, finding both defendants equally negligent, returned a verdict of $575,000.

The trial court granted PCC's post-trial motion for a new trial, but never properly ruled on Ferguson's post-trial motion. However, as set forth above, *see supra* at 718–19 n. 4, Ferguson's post-trial motion was untimely. After sketching out the procedural history of the case and reviewing what it found to be the most inflammatory comments made by Holland during his summation, the court's entire account of its reasoning was as follows: "Even though a jury is presumed to follow the Court's instruction, it is impossible to conclude anything but that the verdict as rendered wrongly included an amount for punitive damages. A new trial must be granted." Trial Court Opinion ("T.C.O."), 2/4/2013, at 4. The court cited no legal authority and did not elaborate in any way on such in-court observations as the court

might have made, beyond the comments themselves, that compelled its ruling.

Ferguson's appeal revolves around the trial court's view that Holland's summation implicitly and improperly inveigled the jury to award punitive damages against PCC. The trial court awarded a new trial because punitive damages had not been pleaded or addressed as such during trial, and therefore could not be sought. *See Houston v. Texaco, Inc.*, 371 Pa.Super. 399, 538 A.2d 502, 506 (1988) ("The general rule is that damages must be pleaded. The pleadings determine the relief that may be afforded: Neither allegations without proof nor proof without allegations, nor allegations and proof which do not substantially correspond, will entitle complainant to relief...." (internal quotation marks omitted)). Ferguson argues that the jury's $575,000 verdict exceeded by only a *de minimis* amount the economic damages proved at trial, which, based upon Dr. Spergel's testimony, and including other stipulated damages, could have been set as high as $557,541.34. Moreover, Ferguson's injuries were consistent with a substantial award of non-economic damages, which more than justified the modest difference between the verdict and Ferguson's evidence of economic damages. Accordingly, the trial court erred in presuming that the jury's verdict improperly included punitive damages, when (a) the trial court met each of Ferguson's counsel's transgressions with an appropriate and detailed curative instruction; (b) the economic damages proved at trial were sufficient to explain the verdict without reference to punitive damages; and (c) there is no indication of record that the

---

**7.** The default setting refers to an alleged setting on PCC's computer that automatically entered "M" in a field reserved for the buyer's vehicle license status. *See* N.T., 7/31/2012, at 43–45. It appears to be undisputed that, at the time of the purchase, Morton lacked the "M" designation on his license, and that he, therefore, was not licensed to operate a motorcycle. N.T., 7/30/2012, at 212–13.

jury intended to award anything more than those economic and non-economic damages, which together constituted a proper non-punitive award supported by the evidence. These considerations, Ferguson contends, rendered it an abuse of discretion for the trial court to conclude that Holland's summation so prejudiced the jury as to require a new trial.

In rebuttal, PCC notes that Holland made additional references to non-compensable losses, such as the repossession of Ferguson's car, her eviction, and litigation fees. *See* Brief for PCC at 16; N.T., 8/1/2012, at 80–81. However, PCC principally echoes the trial court's concern for comments that appeared to invite the jury to award punitive damages, despite the fact that they had not been pleaded, and no foundation for their award lain, during the trial.

■ We begin by acknowledging the considerable latitude generally afforded counsel in making closing arguments. *See Millen v. Miller*, 224 Pa.Super. 569, 308 A.2d 115, 117 (1973). Thus, our Supreme Court has held that it is not improper argument when statements in a complained-of summation, "while not in good taste, offend[ ] rather in their floridity than in any capacity to influence or prejudice the minds of the jury." *Libengood v. Penna. R. Co.*, 358 Pa. 7, 55 A.2d 756, 758 (1947). Our Supreme Court further has explained as follows:

> A trial in an American court is distinctly an adversary proceeding and is therefore bound at times to excite counsel into making statements overladen with partiality. However, so long as decorum is maintained, and there is no leaving the highway of fact to agitate in the marshes of palpable exaggeration, unwonted[ ]characterizations, hortatory appeals to latent prejudices, and improper imputations of gross motives, there is no

reason why lawyers should not be permitted to express themselves in such manner as they believe best serves the interests of justice. The responsibility is on the trial judge to see that counsel do not transgress the bounds of what is proper, wholesome, and fair. [The judge] accomplishes this end by employing judicious suggestion and, if necessary, stern admonition.

> \*      \*      \*

> In *Contractors Lumber & Supply Co. v. Quinett [Quinette ]*, 386 Pa. 517, 126 A.2d 442, 444 [ (1956) ], this Court said:

>> There is nothing in the law, and certainly nothing in the history of American forensic appeal, which remotely suggests that a lawyer's summation must be a prosaic and dull affair, devoid of metaphor, empty of simile, and stranger to dramatic, poetical, or sentimental allusion. So long as no liberties are taken with the evidence, a lawyer is free to draw such inferences as he wishes from the testimony and to present his case in the light most suited to advance his cause and win a verdict in the jury box.

*Rondinelli v. City of Pittsburgh*, 407 Pa. 89, 180 A.2d 74, 77–78 (1962) (internal quotation marks omitted; citations modified).

■ Our analysis hinges upon the principal question debated by the parties: Whether the trial court abused its discretion in determining that Holland's facially inappropriate argument, and his repeated refusals to abide clear instructions by the trial court to refrain from making that argument, so prejudiced the jury as to undermine confidence in the verdict. We focus upon the question of prejudice, because we assume, *arguendo*, that the trial court did not abuse its discretion in finding that Holland's commentary and implacable

persistence in the face of the trial court's admonitions and warnings "tend[ed] to influence the jury in resolving the issues before them solely by an appeal to passion and prejudice," and had little or nothing to do with the evidence of record, as proscribed by reams of Pennsylvania case law. *See, e.g., Commonwealth v. Dennis,* 552 Pa. 331, 715 A.2d 404, 411–12 (1998) (quoting *Commonwealth v. Johnson,* 516 Pa. 527, 533 A.2d 994, 996 (1987)) (" '[T]he first and brightest line' of impropriety in a closing argument is 'at the point where the language and inferences of the summation no longer relate back to the evidence of record.' "); *Young v. Washington Hosp.,* 761 A.2d 559, 563 (Pa.Super.2000) (quoting *Narciso v. Mauch Chunk Twp.,* 369 Pa. 549, 87 A.2d 233, 234 (1952)).

▆ In this case, however, prejudice presents a thornier question. We afford the trial court considerable but less than absolute deference in assessing the prejudicial effect on a jury of improper argument by counsel:

> [I]n the heat of trial, counsel may make a statement which is not justified by the record but which may or may not have had a prejudicial effect on the jury. For that reason the granting of a new trial rests largely in the discretion of the trial judge.... [T]he trial judge is in a better position to see and understand the atmosphere of the trial and the effect the statement had on the jury. But this Court is quick to act when there has been an abuse of discretion and that is determined by an examination of the remark made, the circumstances under which it was made and the precautions taken by court and counsel to remove its prejudicial effects.

*Narciso,* 87 A.2d at 234–35 (citations omitted).

Notably, the cases cited by PCC in support of the proposition that Holland's comments must be presumed to have prejudiced the jury all involved more than simply inflammatory comments, although such comments certainly played into the courts' rulings in those cases. *See* Brief for PCC at 18. For example, in *Narciso,* our Supreme Court alluded to its earlier decision in *Saxton v. Pittsburg Railways Co.,* 219 Pa. 492, 68 A. 1022 (1908), for the proposition that it is improper to allude to "the size of a defendant corporation and its ability to pay a large verdict." *Narciso,* 87 A.2d at 235. However, in both *Narciso* and in *Saxton* the prejudice presumed to be caused by the remarks in question was exacerbated by additional flaws in the proceedings that contributed to the prejudice. *See Narciso,* 87 A.2d at 235 (noting that the trial court's failure to offer a curative instruction "might well have lent authority to the statement by implying judicial sanction of it"); *Saxton,* 68 A. at 1022–23 (focusing upon counsel's unfounded allegation that the opponent had withheld evidence, rather than follow-up comments attempting to incite passions against the corporate defendant). Thus, those cases do not provide strong support for the trial court's ruling in the instant case.

▆ In this case, virtually all of PCC's objections—and every material objection to the particularly offensive matter highlighted above—were sustained. Moreover, following its ruling on each objection, the trial court reprimanded Holland with increasing pointedness, and in all instances followed with a detailed, accurate curative instruction explaining why the comments in question were improper and should be disregarded by the jury. When Holland persisted to argue in the same improper vein, the trial court cut off his argument entirely in an emphatic demonstration to the jury of how inappropriate the court believed Holland's conduct to be. Finally,

in its jury charge, the trial court again touched upon all of the considerations implicated by Holland's complained-of assertions and again explained accurately and in detail the infirmity of those comments and the necessity that the jury disregard them. N.T., 8/1/2012, at 126–27. Jurors are presumed to obey the court's instructions, and, if ever an inappropriate comment could be cured by sufficient correction and admonition from the bench, the trial court's efforts in this case would suffice. *See In re Smith,* 396 Pa.Super. 624, 579 A.2d 889, 896 (1990) ("[T]he jury is presumed to have acted within the legal parameters established by the court and with a proper evaluation and weighing of the evidence.").

It is worth emphasizing that in the context of improper remarks such as these, we tend to invoke the words "passion" and "prejudice" without defining them, leaving only prior case-specific analyses to guide us in determining whether sufficient impropriety occurred to support a trial court's award of a new trial. However, it is self-evident that prejudice mounts as the tenor of the comments in question grows more flagrantly improper and the frequency of similar comments increases.

Although the inquiry can be nebulous based only upon a cold record, in this case we have uncommon indicia of the effect of the arguments in question. First, we have the only nominally disputed point that the award of damages only minimally outstripped the upward bound of the various relevant economic damages of which Ferguson

submitted proof at trial.[8] Moreover, the jury was within its province to award non-economic damages for pain and suffering, a matter upon which the trial court charged the jury. *See* N.T., 8/1/2012, at 128 ("[Ferguson] is entitled to be compensated for all the pain, suffering, and emotional distress she has sustained from the time of the accident to the present, or she will sustain from right now into the future for as long as she will live."). Given the undisputed trauma of the initial accident; the pain and hardship Ferguson experienced in its immediate wake due to her injuries; the lengthy period of rehabilitation that followed her time in the hospital; and the evidence that certain of her injuries would cause her some degree of disability and pain for the rest of her life with the attendant need for continuing treatment, a jury might reasonably have awarded significant non-economic damages.

The second indication that the jury was not unduly prejudiced comes in the allocation of liability. The defendants in this case were Morton, the alleged operator of the motorcycle at the time of the accident, and the dealership which sold the motorcycle to Morton. Between these defendants, the jury assessed liability equally. Had the jury been unduly affected by Holland's inflammatory arguments, and had the jury inflated its damage award as a consequence of those comments, it is counterintuitive that they would have done so at the expense of Morton, who was not in any way implicated in the complained-of comments.[9] That the jury apportioned liabili-

---

**8.** PCC disputes aspects of Ferguson's claims before this Court regarding the substance and probity of the evidence of damages recited by Ferguson in her brief. Brief for PCC at 21–22. However, PCC's arguments in this regard to the weight of the evidence, not to its admissibility or its support in the record. Assessing the value and credibility of the evidence rests with the jury. That a jury might

have ruled otherwise based upon the evidence before it does not change the fact that the record could sustain an award of over $500,000 in compensatory damages as well as substantial noneconomic damages.

**9.** Indeed, Holland's emphasis on the corporate status of PCC would ostensibly work in

ty equally implies that the jurors did not calibrate their award in magnitude or apportionment to punish PCC.

The trial court provided almost no insight into its basis for determining that Holland's remarks were so prejudicial as to require a new trial. In its opinion, the trial court merely excerpted Holland's summation and offered a conclusory statement to the effect that these comments necessarily prejudiced the jury, notwithstanding the court's numerous and persistent efforts to ameliorate each transgression and preserve the integrity of the trial. While we deplore Holland's intractability in flouting the trial court's clear directions, we nonetheless disagree that the remarks in question so obviously compromised the jury's deliberations as to establish a basis for the grant of a new trial. To the contrary, we believe that the trial court's curative instructions, admonitions of Holland in the presence of the jury, and the court's jury charge were more than ample to ameliorate any risk of undue harm to PCC's interests, and that the jury's verdict signaled that no such unfairness actually resulted from Holland's regrettable behavior. Consequently, we reverse the trial court's order granting PCC's post-trial motion and granting a new trial.

Order reversed. Case remanded. Jurisdiction relinquished.

Morton's favor by shifting the jury's attention and inflaming its passions against PCC.