J-A21032-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| CRAIG STELTZ | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| WILLIAM C. MEYERS, M.D.; VINCERA | : | |
| CORE INSTITUTE AND VINCERA | : | |
| INSTITUTE | : | No. 179 EDA 2019 |
| | : | |
| Appellants | : | |

Appeal from the Order Entered December 12, 2018
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s):  March Term 2016- 01720

BEFORE:  BOWES, J., OLSON, J., and FORD ELLIOTT, P.J.E.

DISSENTING MEMORANDUM BY BOWES, J.:          **FILED APRIL 14, 2020**

I respectfully dissent.  While I recognize that this Court's standard of review over a trial court's award of a new trial is deferential, this case presents that rare circumstance in which the trial court has abused its discretion.  In particular, I believe that both the trial court and the Majority have mischaracterized the context of the question posed by Appellant's counsel and overstated the existence of prejudice.  Accordingly, I would reverse the trial court's order granting a new trial, and permit the jury's verdict to stand.

Appellee Craig Steltz's claims for relief were directed at an alleged breach of the professional standard of care[1] by Appellant William C. Meyers,

_____

[1]  Mr. Steltz's expert David Treen, Jr., M.D. ("Dr. Treen"), espoused his view of the applicable standard of care.  **See** N.T. Trial, 8/6/18, at 5 ("[Dr. Treen's]

M.D. ("Dr. Meyers"). Specifically, Mr. Steltz underwent surgery on May 1, 2014, for athletic pubalgia—or a "sports hernia"—in his right leg. Mr. Steltz was, at that time, a player for the Chicago Bears of the National Football League ("NFL"). During practice on June 19, 2014, Mr. Steltz felt a "pop" in his right leg. Mr. Steltz returned to Dr. Meyers for a consultation on June 30, 2014. At bedrock, this case concerns competing interpretations of an MRI taken that day that was reviewed by, *inter alia*, Dr. Meyers, Adam Zoga, M.D. ("Dr. Zoga"), and Peter Read, M.D. ("Dr. Read").

Both Dr. Meyers and Dr. Zoga testified that they collectively reviewed and discussed the June 30, 2014 MRI of Mr. Steltz's right leg that same day, and concurred in the assessment that the image indicated "a little bit of scar breakup" and fluid at the surgery site. **See** N.T. Trial, 8/7/18 (Part II), at 14; **see also** N.T. Trial, 8/9/18 (Part II), at 47, 49. Based upon this diagnosis, Mr. Steltz returned to his training and practice regimen with the Chicago Bears. Ultimately, Mr. Steltz was released from the athletic organization.

As pled, Mr. Steltz's case focused upon a report that was reviewed and approved by Dr. Read,[2] and which was provided to Appellants at some point

_____

testimony revealed the steadfast opinion, whether or not the jury chooses to believe it, that [Dr. Read's interpretation of] the June 30, 2014 MRI should have been disclosed to Mr. Steltz, and the failure to do so deprived Mr. Steltz of the opportunity for treatment . . . .").

[2] Although Dr. Read approved the report interpreting the June 30, 2014 MRI as showing a "complete tear" of Mr. Steltz's common adductor muscles, it was actually authored by a trainee named Zombor Zoltani. **See** N.T. Trial, 7/31/18

**after** their June 30, 2014 assessment of Mr. Steltz had already been completed and communicated to Mr. Steltz.[3] **See** Complaint, 5/25/16, at ¶¶ 19-46. That report diverged significantly from the initial assessment rendered by Dr. Meyers and Dr. Zoga, and instead concluded that Mr. Steltz had suffered a "complete tear" of his adductor muscle. **See** N.T. Trial, 7/31/18 (Part I), at 62. Although this report was ultimately found in Appellants' records, it is not clear how or at what point that report was transmitted to Appellants.[4] **See** N.T. Trial, 7/31/18 (Part II), at 52-53.

Regardless, Mr. Steltz's claims for relief revolve around the allegedly delayed disclosure of the opinions expressed in Dr. Read's report **and** the validity of Dr. Read's underlying analysis, as made clear in both his opening and closing statements. **See** N.T. Trial, 7/31/18 (Part I), at 23-28; N.T. Trial, 8/10/18 (Part II), at 16-17 ("The negligence of Dr. Meyers is [his] arrogance of certainty about an injury that was interpreted completely different[ly]. His failure to communicate to his patient and . . . his patient's employer . . . that there was evidence of a tear."). Indeed, even Mr. Steltz testified that he

_____

(Part II), at 13-14. Dr. Read was the attending radiologist who reviewed it, concurred in its analysis, and approved the report. **Id**.

[3] Dr. Read did not review and approve the report created by Mr. Zoltani until July 3, 2014, and he did not dictate it until July 5, 2014. **See** N.T. Trial, 7/31/18 (Part II), at 14-16, 53.

[4] Dr. Meyers testified that he "likely" saw the report for the first time on August 27, 2014, when Mr. Steltz requested a copy of his medical records after being released by his employer. **Id**. at 54, 56. Mr. Steltz testified that he first became aware of the report on September 11, 2014, when he received a copy of his records. **See** N.T. Trial, 8/2/18 (Part II), at 79.

blamed Dr. Meyers specifically because of his alleged misinterpretation of the MRI. *See* N.T. Trial, 8/2/18 (Part II), at 88 ("It wasn't the Bears' doctor I went and saw, who read the MRI, and so I felt like Dr. Meyers was at fault for it and not the Bears.").

Despite the critical nature of the June 30, 2014 MRI and Dr. Read's assessment of the injury it depicted, it is undisputed that Mr. Steltz did not present any corroborating expert testimony from a musculoskeletal radiologist at trial.[5] Dr. Read testified on behalf of Mr. Steltz as a fact witness, and was never qualified as an expert.[6] *See* Pa.R.E. 702. An expert on musculoskeletal

---

[5] In relevant part, Appellee presented testimony from David Treen, Jr., M.D. ("Dr. Treen"), who was qualified as an expert in "athletic pubalgia" and testified that his physical examination of Mr. Steltz indicated that he had a torn adductor muscle. *See* N.T. Trial, 8/1/18 (Part I), at 55-58. However, he freely confessed that he could not opine about the competing interpretations of the June 30, 2014 MRI. *Id*. at 92-93 ("The two reports describe two totally different findings. **I don't know which one is true and which one is false**, . . . ." (emphasis added)). Along similar lines, Mr. Steltz also presented videotaped testimony from Benton Emblom, M.D., who was qualified as an expert in orthopedic surgery. *See* N.T. Trial, 8/2/18 (Part I), at 40-41. He similarly opined that Mr. Steltz had suffered a torn adductor muscle at some indeterminate point. *See* N.T. Trial, 8/2/18 (Part II), at 83-84.

[6] Mr. Steltz went to great lengths to establish Dr. Read's *bona fides* with respect to musculoskeletal radiology. *See* N.T. Trial, 7/31/18 (Part I), at 49-51; N.T. Trial, 7/31/18 (Part II), at 25-26. However, he freely allowed that Dr. Zoga was a far more experienced and accomplished radiologist with respect to musculoskeletal imaging. *See* N.T. Trial, 7/31/18 (Part II), at 6-8. The burden for such qualification is quite deferential. "[T]he test to be applied when qualifying an expert witness is whether the witness has **any** reasonable pretension to specialized knowledge on the subject under investigation. If he does, he may testify and the weight to be given to such testimony is for the trier of fact to determine." ***Freed v. Geisinger Med. Ctr.***, 971 A.2d 1202,

radiology was listed as potential witness on Mr. Steltz's pre-trial statement. **See** Plaintiff's Pretrial Memorandum, 2/15/18, at 4 (identifying Jamie Checkoff, M.D. as an "expert"). However, Dr. Checkoff did not testify at trial, and no other qualified expert addressed the merits of Dr. Read's analysis on behalf of Mr. Steltz.

After Mr. Steltz had rested his case-in-chief, Appellants offered the testimony of Dr. Jana Crain ("Dr. Crain"), a musculoskeletal radiologist who was qualified as an expert in "interpreting MRI images of the core muscle region." **See** N.T. Trial, 8/6/18 (Part II), at 42, 52. Overall, Dr. Crain flatly disagreed with the conclusions in the report approved by Dr. Read. **Id**. at 64-65, 71. Thereafter, Dr. Zoga testified as both a fact and expert witness. **See** N.T. Trial, 6/7/18 (Part I), at 41-43. However, Appellants' qualification of Dr. Zoga was unusually fraught with an extended series of inflammatory questions and remarks by Mr. Steltz's counsel that directly touched upon the respective credibility of not only Dr. Zoga, but also Dr. Read.

Mr. Steltz's counsel opened this qualification cross-examination with a series of remarks concerning Dr. Zoga's "enormous, enormous ego." **Id.** at 29. An immediate objection was sustained. **Id**. at 30. Moments later, however, Mr. Steltz's counsel again insinuated that Dr. Zoga was inflating his professional acumen, asking whether other "doctors come up to you, boy, Dr.

_____

1209 (Pa. 2009) (emphasis in original; internal citation omitted). Still, Mr. Steltz apparently chose to concede the opportunity to allow his key witness to explain his interpretation of the MRI.

Zoga, you're the go-to guy?" *Id*. at 31. Another objection was sustained. *Id*. at 32. Counsel launched into a series of inquiries concerning **Dr. Read's** professional qualifications and credibility, first suggesting that Dr. Read must be competent and accurate in his work due to the fact that he hadn't been "fired" after this incident. *Id*. at 35-36 ("Wouldn't you, if you knew that one of your people couldn't do his job right—you don't want him analyzing images that affect the lives of people, do you?"). For a third time, Appellants objected on the ground that this testimony was inappropriately touching upon Dr. Read's credibility. The trial court, again, sustained the objection. *Id*. at 36.

However, Mr. Steltz's counsel persisted and continued to cross-examine Dr. Zoga about Dr. Read, including adducing testimony that Dr. Read: (1) was a board-certified radiologist; (2) completed a fellowship in musculoskeletal radiology; (3) was still employed by his then-employer; and (4) continued to review and interpret radiology images, including MRI. *Id*. at 36-37. Eventually, defense counsel raised another objection when Mr. Steltz's counsel began to examine Dr. Zoga regarding his substantive review of the report approved by Dr. Read. *Id*. at 44-47. Ultimately, the trial court qualified Dr. Zoga as an expert in musculoskeletal radiology without any discrete objections to his qualifications. *Id* at 47.

Throughout the qualification examination of Dr. Zoga, Mr. Steltz's counsel comported himself in a manner that smacked of unprofessionalism, even based upon the cold record. His questions to Dr. Zoga and his responses to defense counsel and the trial court were peppered with sarcastic asides and

feigned contrition, despite admonitions from the trial court. *Id*. at 29-31, 33-36, 40-42, 46.

Immediately after this prolonged and heated exchange, defense counsel advanced the line of questioning that precipitated this appeal:

> DEFENSE COUNSEL: [H]ow many musculoskeletal radiologists do you think there are in the country[,] ballpark?
>
> DR. ZOGA: So if the definition is radiologists who interpret musculoskeletal imaging, it has to be five thousand.
>
> DEFENSE COUNSEL: Five thousand. Five thousand of those radiologists and [Mr. Steltz] couldn't find one of them to come into this courtroom to support Dr. Read, did you know that?

*Id*. at 48. The question was not answered, but it did provoke a strenuous objection from Mr. Steltz's counsel, who requested a mistrial. Defense counsel responded that: (1) the question was simply a fair response to Mr. Steltz's counsel's repeated "borderline" comments; and (2) the "only prejudice" to Mr. Steltz was that the comment was "factual." *Id*. at 51.

The trial court declined to grant a mistrial, noting that both parties had made "occasional statements" that were problematic. *Id*. at 52. Instead, the trial court issued a curative instruction regarding defense counsel's allegedly inappropriate question, addressing the jury as follows:

> When we were last here, there was an exchange between the counsel and I just wanted to state, as I stated at the beginning of the trial, that the statements and arguments made by counsel do not constitute evidence. They are not the facts. Evidence includes any testimony of witnesses, documents, and other exhibits submitted during the trial constitute facts and I just ask that you understand that particular principle, as you evaluate the evidence, okay.

So the parties or counsel have agreed to proceed in a civil fashion. So we'll continue. Thank you.

N.T. Trial, 8/7/18 (Part II), at 4-5.

During defense counsel's closing statement, he reiterated his earlier point regarding the lack of expert support for Mr. Steltz's position: "Why wouldn't they come in and hire a radiologist to tell us, yeah, I looked at those images and Dr. Read is correct." N.T. Trial, 8/10/18 (Part II), at 52; *see also id*. at 33 ("You heard from musculoskeletal radiologists that there was no tear, and that there was no retraction . . . . It's unquestionable, undeniable, and [Mr. Steltz] brought in no one to dispute it."). Pertinent to our review, no objection was lodged by Mr. Steltz with respect to these statements. *Id*.

Following a verdict in favor of Appellants, the trial court ultimately granted Mr. Steltz's post-trial motion for a new trial, grounding its reasoning in three separate findings, namely: (1) that defense counsel's question was inappropriate; (2) that the question was also prejudicial as it undermined the validity of the entire trial; and (3) that the prejudice was of such a type and magnitude that it could not be remedied via a curative instruction. *See* Trial Court Opinion, 12/12/18, at 6-7 ("There was no curative instruction this Court could have delivered to the jury to fix the harm caused by [Appellants'] counsel's egregious statement that not one musculoskeletal radiologist among the 5,000 who practice in the United States could be found to support [Dr. Read's] reading of the MRI.").

The learned Majority has largely concurred in the trial court's legal and factual assessment. I must respectfully dissent with respect to each finding.

The legal standards that govern our review of a trial court's awarding of a new trial are well-established, and admittedly deferential to the trial court's decision. As a general matter, a trial court engages in a two-step process when responding to a request for a new trial by determining: (1) whether one or more mistakes occurred at trial; and (2) whether that mistake is a sufficient basis for granting a new trial. ***See Ferguson v. Morton***, 84 A.3d 715, 720-21 (Pa.Super. 2013). An appellate court essentially engages in the same analysis in reviewing the decision of the trial court:

> First, the appellate court must examine the decision of the trial court that mistake occurred. . . . If the mistake involved a discretionary act, the appellate court will review for an abuse of discretion. If the mistake concerned an error of law, the court will scrutinize for legal error.
>
> If the appellate court agrees with the determination of the trial court that a mistake occurred, it proceeds to the second level of analysis. The appellate court must then determine whether the trial court abused its discretion in ruling on the request for a new trial. An abuse of discretion exists when the trial court has rendered a judgment that is manifestly unreasonable, arbitrary, or capricious, has failed to apply the law, or was motivated by partiality, prejudice, bias, or ill will. A finding by an appellate court that it would have reached a different result than the trial court does not constitute a finding of an abuse of discretion. Where the record adequately supports the trial court's reasons and factual basis, the court did not abuse its discretion.

***Id***. at 720 (internal citations and quotation marks omitted).

Where, as here, the trial court "articulates a single mistake (or a finite set of mistakes), the appellate court's review is limited in scope to the stated

- 9 -

reason, and the appellate court must review the reason under the appropriate standard."[7] *Harman ex rel. Harman v. Borah*, 756 A.2d 1116, 1123 (Pa. 2000). However, this assessment is not merely focused upon the mistake itself, but also properly includes the attendant "circumstances under which the statements were made and the precaution taken by the trial court and counsel to prevent such remarks from having a prejudicial effect." *Siegal v. Stefanyszyn*, 718 A.2d 1274, 1277 (Pa.Super. 1998).

As the Majority correctly points out, "[i]t is improper for counsel to present facts to the jury **which are not in evidence** and which are prejudicial to the opposing party," such that "counsel may not comment on evidence to the effect that it removes an issue of credibility from the jury." *Young v. Washington Hosp.*, 761 A.2d 559, 563 (Pa.Super. 2000) (emphasis added).

The Majority relies heavily upon the holding in *Siegal*, *supra*, to affirm the trial court's conclusion that defense counsel committed a "mistake" by questioning Dr. Zoga regarding Mr. Steltz's self-evident lack of expert radiology testimony. *See* Majority Memorandum at 11-12. In *Seigal*, defense counsel in a medical malpractice case made an improper statement during closing arguments, which ultimately resulted in the awarding of a new

---

[7] The trial court stated that it relied solely upon defense counsel's question in granting a new trial. *See* Trial Court Opinion, 3/4/19, at 4 ("We wish to take this opportunity to disabuse [Appellants] of the notion that we might have relied on misconduct other than defense counsel's improper question to Dr. Zoga in granting a new trial.").

trial. At the outset of the trial in *Siegal*, one of plaintiff's fact witnesses—Dr. John Shore—had been precluded from offering expert testimony that the defendant's actions fell below the "applicable standard of care." *Id*. at 1276. During closing, defense counsel directly referred to this lack of testimony from Dr. Shore, stating that its absence indicated that no malpractice occurred. *Id*. On appeal, this Court concluded that these statements were improper. *Id*. at 1277 ("[C]ounsel's argument was clearly improper, as it conveyed to the jury something that counsel knew to be untrue, *i.e.*, that Dr. Shore's opinion was not favorable to appellants' case."). The statement "so polluted the jury that the effect could not be cured by the curative instruction that was given." *Id*.

Instantly, defense counsel's objectionable question was as follows: "Five thousand of those radiologists and [Mr. Steltz] couldn't find one of them to come into this courtroom to support Dr. Read, did you know that? N.T. Trial, 8/7/18 (Part I), at 48. In particular, the Majority has focused upon the use of the words "could not find" as proof positive that defense counsel was somehow misrepresenting the fact that Mr. Steltz had listed Dr. Checkoff as a potential expert witness:

> Appellants' counsel, having received a copy of [Mr. Steltz's] pre-trial memorandum, was, therefore, put on notice that [Mr. Steltz] **did find** and planned to call as a potential witness another radiologist whose findings concurred[8] with Dr. Read's findings

---

8 Like the trial court, the Majority has characterized Dr. Checkoff's report as corroborating Dr. Read's interpretation of the June 30, 2014 MRI. *See* Majority Memorandum at 11; Trial Court Opinion, 12/12/18, at 11 n.3.

that the June 30, 2014 post-surgery MRI revealed a tear in the adductor longus muscle, an allegation that formed the basis of [Mr. Steltz's] complaint. As such, when appellant's counsel stated that [Mr. Steltz] "couldn't find" verses "did not find" another radiologist who would agree with Dr. Read's findings, his comment was analogous to the statement made by counsel in **Siegal**.

Majority Memorandum at 11.

With all due respect to the learned Majority, **Siegal** is inapposite. By focusing solely upon the verb utilized by defense counsel to the exclusion of all other substance, the Majority has mischaracterized the basic import of counsel's question. In relevant part, defense counsel's statement betrayed no misrepresentation, but drew valid attention to the indisputable fact that Mr. Steltz had not presented expert testimony regarding the correctness of Dr. Read's interpretation of the June 30, 2014 MRI, a critical issue in this case. In contrast to **Siegal**, there was no ruling from the trial court precluding Mr. Steltz from presenting Dr. Checkoff's expert testimony. Hence, defense counsel was not exploiting an adverse ruling, but properly referring to an

---

However, Dr. Checkoff's report concludes that the June 30, 2014 MRI indicates only a "partial tear" of the adductor muscle. **See** Plaintiff's Pretrial Memorandum, 2/15/18. I also note that "[i]t is well established that a report prepared by an expert who is not called to testify as a witness is hearsay." **Semieraro v. Commonwealth Utility Equipment Corp.**, 544 A.2d 46, 47 (Pa. 1988); **see also Kopytin v. Aschinger**, 947 A.2d 739, 745 (Pa.Super. 2008) (same). Permitting Mr. Steltz to benefit from the contents of an expert report that originated from a non-testifying witness is particularly suspect in light of the rationale behind this maxim. **See Phillips v. Gerhart**, 801 A.2d 568, 575 (Pa.Super. 2002) (observing that opinions contained in medical reports are inadmissible "unless the doctor who prepared the report is available for in-court, cross-examination regarding the accuracy, reliability, and veracity of his or her opinion").

unforced error: that Mr. Steltz offered no testimony from a musculoskeletal radiologist corroborating Dr. Read's interpretation of the June 30, 2014 MRI.[9]

As such, I do not perceive defense counsel's question to be the flagrant misrepresentation of a fact outside of the jury's knowledge as identified by the Majority, but a question duly predicated upon: (1) the lack of expert radiology testimony presented by Mr. Steltz; and (2) Dr. Zoga's testimony that there were approximately 5,000 musculoskeletal radiologists potentially available for such consultations. Both of these facts were of-record. Moreover, Dr. Read's interpretation of the June 30, 2014 MRI was both the subject upon which Dr. Zoga was called to testify, and the lynchpin of Mr. Steltz's case. Although inartfully phrased, I do not believe that defense counsel's question here is in the same disfavored category as the statement identified in **Siegal**.

I also believe that the Majority and the trial court have failed to properly view the entirety of the circumstances surrounding defense counsel's question in assessing this "mistake." Immediately before defense counsel asked his question, Mr. Steltz's counsel had just finished attacking Dr. Zoga's credibility, as bolstering Dr. Read's interpretation of the June 30, 2014 MRI, over numerous sustained objections. **See** N.T. Trial, 8/7/18 (Part I), at 29-47. I note that "[e]ven an otherwise improper comment may be appropriate if it is

---

[9] At the close of the defense case, Mr. Steltz was afforded an opportunity to present rebuttal testimony, but largely limited his presentation to demonstrative testimony not relevant to this appeal. **See** N.T. Trial, 8/10/18 (Part I), at 41-53. No rebuttal expert testimony was adduced.

- 13 -

in fair response to [opposing] counsel's remarks." ***Commonwealth v. Burno***, 94 A.3d 956, 974 (Pa. 2014).

Stated directly, Mr. Steltz's counsel's pursued an inflammatory and inappropriate line of interrogation with Dr. Zoga regarding both his credibility, and that of Dr. Read. As Appellants have argued, I believe that the fair response doctrine applies quite aptly to these circumstances.[10] Counsel's remarks do not constitute reversible error where they are "a reasonable response, in both scope and force, to trial counsel's attack on the witness' credibility." ***Commonwealth v. Hanible***, 30 A.3d 426, 470 (Pa. 2011).

Here, defense counsel's single question appears quite proportional in light of the conduct of Mr. Steltz's counsel detailed above. Specifically, Mr. Steltz's counsel was responsible for initially broaching the subject of credibility on multiple fronts during his cross-examination of Dr. Zoga. Moreover, he did so in a way that was clearly calculated to buttress Dr. Read's credibility and diminish Dr. Zoga's credibility. In the face of such gamesmanship during an adversarial contest, defense counsel cannot be expected to stand mute.

In short, I must part ways from the Majority with respect to its affirmance of the trial court' conclusion that defense counsel's question was

---

[10] ***See*** Appellants' brief at 22 (arguing that even if defense counsel's question "broached an improper subject," it was nonetheless a "fair response" to the questioning perpetrated by Mr. Steltz's counsel); ***see also*** N.T. Trial, 8/7/18 (Part I), at 51 (same argument preserved at trial).

inappropriate.[11] With specific reference to our standard of review, I do not believe that the record sufficiently supports the legal and factual assessments rendered by both the Majority and the trial court. While my own analysis would end at this point, I will also briefly address the remainder of the Majority's contentions.

"A new trial is not warranted merely because some irregularity occurred during the trial . . . ." **Harman**, **supra** at 1121. The award of a new trial as a result of improper conduct by counsel is an extraordinary remedy, and is only appropriate if "the unavoidable effect of the conduct or language was to prejudice the factfinder to the extent that the factfinder was rendered incapable of fairly weighing the evidence and entering an objective verdict." **Poust v. Hylton**, 940 A.2d 380, 385 (Pa.Super. 2007).

The Majority's assessment of the second prong of our analysis, *i.e.*, the prejudicial effect of defense counsel's question, also relies quite heavily on its presumption that defense counsel somehow took "liberties" with the facts. **See** Majority Memorandum at 14 (citing **Young**, **supra** at 561; **Siegal**, **supra** at 1277). As indicated above, I do not concur in the assessments of defense counsel's statements under the rubric provided by **Siegal** and **Young**. In the absence of the factual distortion relied upon by the Majority, I find the following discussion from **Ferguson** instructive:

---

[11] **See** Demosthenes, *The Oration of Demosthenes on the Crown*, (1st ed., 1868) at 33 (translated by Sir R.P. Collier) ("But the facts speak for themselves, they are too plain.").

- 15 -

> A trial in an American court is distinctly an adversary proceeding and is therefore bound at times to excite counsel into making statements overladen with partiality. However, so long as decorum is maintained, and there is no leaving the highway of fact to agitate in the marshes of palpable exaggeration, unwonted characterizations, hortatory appeals to latent prejudices, and improper imputations of gross motives, there is no reason why lawyers should not be permitted to express themselves in such manner as they believe best serves the interests of justice.

*Ferguson*, *supra* at 723 (quoting *Rondinelli v. City of Pittsburgh*, 180 A.2d 74, 77-78 (Pa. 1962)).

To my mind, the conclusion that defense counsel's single question undermined confidence in the trial as a whole is not adequately supported by the record or the law. *Accord Ferguson*, *supra* at 725 ("[I]t is self-evident that prejudice mounts as the tenor of the comments in question grows more flagrantly improper and the frequency of similar comments increases."). To the extent that the Majority claims that defense counsel's question "removed" the determination of Dr. Read's credibility from the jury, I re-emphasize that it was Mr. Steltz's counsel who first raised that issue with Dr. Zoga during an extensive cross-examination. *See* N.T. Trial, 6/7/18 (Part I), at 33-47.

Finally, the Majority also relies upon *Siegal* in support of its conclusion that the trial court's curative instruction was insufficient. *See* Majority Memorandum at 14. In *Siegal*, the trial court's curative instruction was found to be insufficient because it "did not accurately convey to the jury what was true, *i.e.*, that [defense] counsel knew that Dr. Shore's opinion would have favored [plaintiff's] position." *Siegal*, *supra* at 1277.

As explained above, I do not find ***Siegal*** to be an adequate parallel to the instant case. Here, the trial court issued a curative instruction directing the jury to disregard the contents of defense counsel's question. ***See*** N.T. Trial, 8/7/18 (Part II), at 4-5. Accordingly, I also fail to see why this curative instruction was insufficient to dispel any potential for prejudice. ***See Ferguson***, ***supra*** at 725 ("Jurors are presumed to obey the court's instructions, and, if ever an inappropriate comment could be cured by sufficient correction and admonition from the bench, the trial court's efforts in this case would suffice."); ***see also In re Smith***, 579 A.2d 889, 896 (Pa.Super. 1990) ("[T]he jury is presumed to have acted within the legal parameters established by the court and with a proper evaluation and weighing of the evidence.").

Based on the foregoing discussion, I respectfully dissent.