**Gail SIEGAL and Richard D. Siegal, Appellants,**

v.

**Mary A. STEFANYSZYN, M.D., Wills Eye Hospital, and Annesley, Flanagan, Fisher, Stefanyszyn and Associaties, Appellees.**

Superior Court of Pennsylvania.

Argued April 21, 1998.

Filed Oct. 15, 1998.

Reargument Denied Dec. 14, 1998.

Joseph R. Podraza, Jr., Philadelphia, for appellants.

Edwin L. Scherlis, Philadelphia, for Stefanyszyn, appellees.

Before SCHILLER, MUSMANNO and HOFFMAN, JJ.*

SCHILLER, Judge:

Appellants, Gail and Richard D. Siegal, bring this appeal from the order entered by the Court of Common Pleas of Philadelphia denying their post trial motions and entering judgment in favor of appellees. We reverse and remand for a new trial.

FACTS:

In 1981, appellant Gail Siegal was diagnosed with Graves' disease. By 1982, the disease had affected her ability to close her eyelids. In January of 1983, Dr. Barrett Haik and Dr. Kenneth O. Rothaus performed eyelid surgery and a frontal brow lift to allow better lid closure in order to prevent corneal abrasions. However, she continued to suffer problems, necessitating additional surgeries. By March of 1984, the muscles that controlled her globes, or eyeballs, had swelled and caused the globes themselves to protrude forward, a condition known as exophthalmos (abnormal protrusion of the eyeball). As a result, she began to develop optic neuropathy with a decrease in color vision, and diplopia (commonly referred to as double vision). Dr. William C. Cooper then per-

---

* Judge Hoffman did not participate in the decision of this case.

formed bilateral orbital decompression surgery. During this procedure he removed the lateral orbital walls from Mrs. Siegal's orbits, as well as the medial halves of her orbital floors, and the inferior halves of her medial walls. The purpose of this operation was to relieve the pressure caused by the expanding muscles and to allow the muscle expansion in such a manner that her orbits would no longer be pushed forward out of her face. In addition, the operation was supposed to allow muscle expansion in a manner that would not damage the optic nerve. The operation successfully reversed Mrs. Siegal's neuropathy, but increased her double vision.

From August 1985 to 1987 Dr. Philip Knapp performed four surgeries to correct the double vision, but the surgeries were only temporarily successful. In 1990, Mrs. Siegal went to see appellee Dr. Stefanyszyn for treatment of her double vision. It is undisputed that Dr. Stefanyszyn performed two operations on her, one on April 18, 1990, and one on May 23, 1990. It is these surgeries which generated the lawsuit which resulted in this appeal.

Following Dr. Stefanyszyn's surgeries Mrs. Siegal suffered from permanent lid misalignment in both eyes, permanent corneal exposure of both eyes, complete loss of motility in her left eye, permanent double vision, and permanent loss of sensation on the left side of her face. She then sought medical care elsewhere, and was treated by Dr. Clinton McCord, Dr. Burton Hoffner, Dr. Barrett Haik, Dr. Glen Jelks, and Dr. John Shore. However, Mrs. Siegal's condition failed to improve.

On July 5, 1991, appellants instituted a medical malpractice action against Dr. Stefanyszyn, the medical group of which she is a shareholder, and Wills Eye Hospital.[1] The complaint alleged that Dr. Stefanyszyn was negligent in performing surgery on April 18, 1990, and that Dr. Stefanyszyn had failed to obtain informed consent for the surgery. Richard Siegal alleged loss of consortium.

On March 12, 1996, the case went to trial before a jury. At trial appellants contended that Dr. Stefanyszyn removed too much bone from Mrs. Siegal's left orbit, causing her left eye to sink into her maxillary sinus cavity. They also contended that the second operation was performed in an effort to correct the doctor's initial mistake. Finally, appellants contended that Dr. Stefanyszyn never informed appellants that she intended to remove bone from the orbit. Dr. Stefanyszyn's defense counsel argued that both surgeries were proper and that appellants were informed of the nature of the operations.

After seventeen days of testimony, the jury returned a verdict in favor of appellees [defendants below]. Appellants filed post trial motions seeking a new trial. On May 14, 1997, the trial court denied appellants' post trial motion, and on July 29, 1997, judgment was entered in favor of appellees. This appeal followed.

## DISCUSSION:

Appellants now raise the following issues: whether the trial court erred in denying their request for a new trial despite defense counsel's misrepresentations to the jury during closing arguments; whether the trial court erred in denying their request to present rebuttal testimony; and whether the trial court erred in denying their request for a new trial based on appellee Stefanyszn's testimony regarding insurance coverage?[2] As a result of our resolution of appellants' first issue, we need not address the remaining two.

■ Our standard of review regarding a trial court's denial of a motion for a new trial is limited. The power to grant a new trial lies inherently with the trial court and we will not reverse its decision absent a clear abuse of discretion or an error of law which controls the outcome of the case. *Kiser v. Schulte*, 538 Pa. 219, 648 A.2d 1 (1994).

Appellants' first issue arose from the following set of circumstances.[3] As noted in

1. Wills Eye Hospital is not an interested party in this appeal. Both parties stipulated that all claims against Wills Eye Hospital were either withdrawn or dismissed with prejudice.

2. We have rephrased appellants' issues in the order in which we have elected to address them.

3. Appellants' first issue actually attacks two aspects of appellee's closing argument. We have elected only to address one, i.e. the part applicable to the argument regarding Dr. Shore, because relief on that issue renders a discussion on the second issue unnecessary. However, we are compelled to remark that the question of wheth-

our factual recitation, during her long odyssey of eye treatment Mrs. Siegal utilized the services of a Dr. John Shore. Appellees' attorneys had previously consulted with Dr. Shore regarding the propriety of Dr. Stefanyszyn's treatment of Mrs. Siegal, and Dr. Shore had rendered to appellee's counsel his opinion that Dr. Stefanyszyn's treatment fell below the applicable standard of care. At trial appellants sought to introduce Dr. Shore as a witness. However, prior to Dr. Shore testifying, appellees' counsel made a motion to specifically preclude him from giving any opinion testimony. This motion was granted and appellants limited their question of Dr. Shore to factual matters such as the interpretation of CAT scans.

Despite the fact that appellees' counsel knew that Dr. Shore considered Dr. Stefanyszyn's treatment to be below the applicable standard of care, and despite the fact that Dr. Shore was precluded from testifying because of appellees' motion, appellees' counsel made the following outrageous argument during his closing argument to the jury:

> But you know; if Mary Stefanyszyn—They really felt that Mary Stefanyszyn had committed malpractice or did not get informed consent, you would have heard that from our friend Dr. Shore. He [Dr. Shore] was the operating surgeon ... He came down here. And they limited him to CAT scans, for which he's not an expert. Came down to testify to CAT scans.
>
> * * * *
>
> Do you think if John Shore really felt that Mary Stefanyszyn had done something wrong that Richard Siegal would let him walk out of this courtroom without saying so? The answer is no.

N.T. April 4, 1996, pp. 88—89.

Appellants' counsel immediately objected to this argument, and the objection was sustained; however, no immediate curative instruction was given. Thereafter, defense counsel was permitted to continue his argument, which he ended without further interruption; a separate defendant was permitted to present closing argument; there was an in chambers conference with the judge and counsel; and the jury was permitted to break for lunch. After lunch there was a sidebar discussion, at the conclusion of which the trial court decided to give the following curative instruction:

> Good afternoon. Okay. Now the earliest opportunity for me to tell you something even though we really haven't gotten to the judge's part of the case, I'm going to take the opportunity, so that something that was said is not in your mind any longer than the lunch hour. And if you hear what I have to say, I think you'll understand it. And you can get it out of your mind as quickly as possible under the circumstances. Now, [defense counsel] made mention of Dr. Shore, Dr. Haik, and Dr. McCord, and reflected that their absence from this courtroom or Dr. Shore's failure to testify that he thought Dr. Stefanyszyn was guilty of malpractice, should be held against the plaintiff, that their absence from the courtroom is asking you to infer that what they would have done, would have said had they come here. And let me tell you the court's view of that. The court does not know that what Dr. Shore's opinion regarding the existence or absence of malpractice would have been, with respect to Dr. [Stefanyszyn]. But even if he had an opinion, I do not know. But you should know that for reasons concerning court procedure, Dr. Shore would not have been allowed to testify as an expert that Dr. Stefanyszyn had committed medical malpractice. For that reason, you may not draw any adverse inferences against the plaintiffs in this case because [Dr. Shore] did not so testify when he was here. Do you understand that? [Defense counsel] said, please hold it against the plaintiffs. I'm telling you you may not. Likewise, you may not draw any adverse inferences against the plaintiffs because other doctors mentioned in the case as treating physicians of Mrs. Siegal, specifically McCord and Haik, did not come to the court and give expert testimony that Dr. Stefanyszyn committed medical malpractice. You may not guess or speculate as to their whereabouts or what their testi-

---

er the trial court's direction limiting cumulative testimony could be relied upon by appellants to excuse the introduction of testimony from treating physicians is an open one, and should be clarified by the parties prior to another trial.

mony might have been if they had any to offer. Is that understood?

N.T. April 4, 1996, pp. 187–189.

■ Whether remarks by counsel warrant a new trial requires a determination based upon an assessment of the circumstances under which the statements were made and the precaution taken by the court and counsel to prevent such remarks from having a prejudicial effect. *Martin v. Philadelphia Suburban Transportation Co.*, 435 Pa. 391, 257 A.2d 535, (1969). It is the duty of the trial judge to take affirmative steps to attempt to cure harm, once an offensive remark has been objected to. *Millen v. Miller*, 224 Pa.Super. 569, 308 A.2d 115 (Pa.Super.1973). However, there are certain instances where the comments of counsel are so offensive or egregious that no curative instruction can adequately obliterate the taint. *Dannals v. Sylvania Township*, 255 Pa. 156, 99 A. 475 (1916) (Counsel characterized defense witness as a "drunkard" from the "slums"). *Saxton v. Pittsburg Railways*, 219 Pa. 492, 68 A. 1022 (1908) (Counsel had argued that defendant had suppressed evidence when there was no evidence of this fact).

■ Here appellees' counsel's argument was clearly improper, as it conveyed to the jury something that counsel knew to be untrue,[4] i.e., that Dr. Shore's opinion was not favorable to appellants' case. *See Wagner v. Hazle Township*, 215 Pa. 219, 224–25, 64 A. 405 (1906). The question before us, however, is whether the trial court's curative instruction was sufficient to cure the harm.[5] On this record we are forced to conclude that it was not. First, the instruction did not accurately convey to the jury what was true, i.e., that appellee's counsel knew that Dr. Shore's opinion would have favored appellant's position. Second, the thrust of the instruction

was not directed toward that damage done, i.e., that the jury was given to believe that appellants were trying to hide something from them. Finally, the outrageousness of appellee counsel's comments and conduct was such as to make it almost impossible for the trial judge to undo the harm. As to the latter point the comments of the late Justice Green of the Pennsylvania Supreme Court, though penned more than a century ago, still ring true:

> The comments of counsel complained of were of the most offensive and reprehensible character, not sustained by any evidence in the cause and justly deserving the severe censure of the court. We can discover nothing to palliate them in the least degree, and inasmuch as there was no other efficacious remedy available to correct the mischief done, it was the plain duty of the court to withdraw a juror and continue the cause [resulting in a new trial]. Many judges are in the habit of doing this upon proper occasion, and that practice deserves to be widely extended, so that counsel who indulge in the habit of making such comments, may be properly admonished that they cannot do so except at severe cost to their clients and themselves.

*Holden v. Pennsylvania Railroad Co.*, 169 Pa. 1, 18, 32 A. 103 (1895) (objecting to false and derogatory characterizations of defendant's witnesses and evidence).

CONCLUSION:

Defense counsel's reference to the absence of opinion testimony of appellants' witness was improper and outrageous, and so polluted the jury that the effect could not be cured by the curative instruction that was given. Therefore, we are compelled to conclude that it was error for the trial court to deny appellants' request for a new trial.[6]

---

**4.** "What greater crime can an orator be charged with than that his opinions and his language are not the same?" *Demosthenes.*

**5.** Appellees have made the rather disingenuous argument that appellants have waived the issue of the effect of the curative instruction when counsel responded to the trial court's proposed curative instruction with the comment "it's better than nothing." However, what appellees fail to state is that appellants' counsel continued to contest the trial judge's ruling until the judge made it clear that the discussion was ended.

N.T. April 4, 1996, pp. 175–181. The purpose of an objection is to acquaint the trial judge with a claim of error and present the judge with an opportunity to correct the error. *Dilliplaine v. Lehigh Valley Trust Company*, 457 Pa. 255, 322 A.2d 114 (1974). Counsel is not required to obstinately argue with the judge after the after he has ruled; indeed, it would be disrespectful of counsel to do so.

**6.** As noted above we have not ruled on appellants' remaining issues because we have granted relief on the first claim of error. We note further

Accordingly, the order of the Court of Common Pleas of Philadelphia is reversed, and this case is remanded to that court for a new trial. Jurisdiction relinquished.

that the remaining issues are not of the type which are likely to arise on retrial: appellants will be able to prepare their case to answer what they claim was a surprise defense, and we are confident that defense counsel will advise witnesses to avoid the mention of insurance.