**[J-51-2021]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

**BAER, C.J., SAYLOR, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| CRAIG STELTZ, | : | No. 10 EAP 2021 |
| | : | |
| Appellee | : | Appeal from the Judgment of |
| | : | Superior Court entered on April 14, |
| | : | 2020 at No. 179 EDA 2019 |
| v. | : | (reargument denied June 18, 2020) |
| | : | affirming the Order entered on |
| | : | December 12, 2018 in the Court of |
| WILLIAM C. MEYERS, M.D.; VINCERA | : | Common Pleas, Philadelphia |
| CORE INSTITUTE AND VINCERA | : | County, Civil Division at No. 01720 |
| INSTITUTE, | : | March Term 2016. |
| | : | |
| Appellants | : | ARGUED: September 21, 2021 |

**OPINION**

**JUSTICE MUNDY**                                    **DECIDED: December 22, 2021**

We granted allowance of appeal to consider whether the Superior Court erred in affirming the trial court's award of a new trial. Because we conclude that the trial court did not abuse its discretion in denying a mistrial based on a single, unanswered question proposed to an expert witness, that decision alone cannot later serve as the basis for granting a new trial. Accordingly, we reverse the order of the Superior Court and remand for further proceedings.

**I. FACTUAL AND PROCEDURAL HISTORY**

In 2016, Craig Steltz filed this medical malpractice action against Dr. William Meyers, Vincera Core Institute, and Vincera Institute (collectively Appellants). On May 1,

2014, Dr. Meyers performed surgery to repair Steltz's athletic pubalgia.[1]  That surgery is not the basis of the alleged malpractice.  Instead, while rehabilitating from that surgery, Steltz, who was a player for the Chicago Bears of the National Football League, felt a pop in his right leg on June 19, 2014.  This led him to return to Dr. Meyers on June 30, 2014, after the Chicago Bears' team physicians performed a magnetic resonance imaging (MRI) on June 27, 2014.  At the June 30th follow-up appointment, Dr. Meyers also performed an MRI on Steltz, discussed the MRI with Dr. Adam Zoga, a musculoskeletal radiologist, and concluded Steltz had scar tissue breakup, a normal postoperative finding, and not a new injury to his adductor muscle.  However, Dr. Paul Read, a second musculoskeletal radiologist, also independently reviewed the June 30th MRI shortly after the June 30th appointment and issued a report concluding the MRI showed a complete tear of the adductor tendon.  Based on these conflicting interpretations of the June 30th MRI, Steltz alleged Dr. Meyers was negligent in failing to diagnose and disclose the existence of the tear as reported by Dr. Read.

The case proceeded to a two-week jury trial, from July 31, 2018 to August 13, 2018.  Steltz presented Dr. Read as a fact witness, who testified that on July 3, 2014, Dr. Zombor Zoltani, a resident, authored the primary report interpreting the June 30th MRI as showing a complete tear, with which Dr. Read agreed and approved in his capacity as the attending radiologist.  N.T., 7/31/18, a.m. session, at 61-62; 7/31/18, p.m. session, at 13-14.  At the time he interpreted the June 30th MRI, Dr. Read was unaware that Dr. Meyers and Dr. Zoga had previously interpreted it as scar tissue breakup.  N.T., 7/31/18, p.m. session, at 13.  At trial, Dr. Read substantially affirmed the conclusion of his report, with the exception that he would classify the injury not as a "tear" but as a complete

---

[1] Athletic pubalgia is an injury to the muscles and tendons of the abdomen and leg that attach to the pubic bone.  It has been commonly referred to as a "sports hernia."

"discontinuity" of the common adductor tendon origin because "tear" connotes trauma, and he was not certain the injury was traumatic. *Id.* at 22-23.

Steltz also presented Dr. Meyers, as if on cross examination, as part of his case-in-chief. Dr. Meyers testified that he had interpreted the June 30th MRI with Dr. Zoga, and he had concluded that Steltz "absolutely did not have a new injury to his adductor muscle. He had scar breakup." *Id.* at 50, 66. Dr. Meyers acknowledged that Dr. Zoga did not issue a report of his read of the June 30th MRI. *Id.* at 49. Further, Dr. Meyers stated that he did not see Dr. Read's report "until much later," when Steltz requested his medical records, and he told Steltz that Dr. Read's report was not correct. *Id.* at 51, 56.

As additional medical expert witnesses, Steltz presented Dr. David Treen and Dr. Benton Emblom. Dr. Treen was qualified as an expert "in the area of sports hernia and athletic pubalgia." N.T., 8/1/18, a.m. session, at 28. Dr. Treen testified that, as a general surgeon, he does not interpret MRIs and relies on radiologists' interpretations. *Id.* at 22. As he does not interpret MRIs, he stated that he could not resolve the conflicting interpretations of Steltz's MRIs. *Id.* at 92-93. Instead, based on his August 16, 2016 visual inspection of Steltz, Dr. Treen opined that "it looked as though the muscle had torn away from the pelvis," and it "would not be a salvageable reconstruction" at that time but it was "more probable than not" that it could have been repaired closer to the time of the injury, two years earlier. *Id.* at 56, 60-61. Dr. Treen also opined that it was below the standard of care to not disclose the results of the June 30th MRI, assuming it showed a complete tear of the adductor longus muscle, to Steltz. *Id.* at 62. Likewise, Steltz presented the videotaped deposition of Dr. Benton Emblom, an orthopedic surgeon, whose expert opinion, based on a September 2014 physical examination, was that Steltz had a torn adductor muscle that was surgically unsalvageable and required physical rehabilitation. N.T., 8/2/18, a.m. session, at 40-41; N.T., 8/2/18, p.m. session, at 83-84.

After presenting other witnesses not relevant to the issue in this appeal, Steltz rested his case-in-chief. N.T., 8/6/18, p.m. session, at 27. Notably, Steltz did not present an expert in radiology to support Dr. Read's interpretation of the June 30th MRI and did not attempt to present Dr. Read as an expert.

Appellants began their case by presenting Dr. Jana Crain, a musculoskeletal radiologist whose practice involved reading MRIs for multiple professional, college, and amateur sports teams. N.T., 8/6/18, p.m. session, at 39-40. On cross examination of her voir dire, Steltz's counsel inquired as to the number of radiologists in the United States whose subspecialty was musculoskeletal radiology, to which Dr. Crain responded that she did not know. *Id.* at 44 (asking "how many radiologists are there in the United States that are musculoskeletal radiologists?" and how many radiologists are members of the society of musculoskeletal radiologists). Further, Steltz's counsel established that there is not a board certification for the subspecialty of musculoskeletal radiology, which is essentially a self-declared specialty. *Id.* at 46. Following voir dire, the trial court accepted Dr. Crain as an expert in musculoskeletal radiology. *Id.* at 52. Dr. Crain testified that, based on her review of the June 30th MRI in conjunction with Dr. Meyers' operative report, she disagreed with Dr. Read's report that there was a complete tear of the common adductor tendon origin. *Id.* at 64. Instead, her opinion was that the June 30th MRI was consistent with Dr. Meyers' postoperative report and showed "either the post[-]op release area hasn't healed or he's torn some scar tissue in this area of post[-]op release." *Id.* at 66.

Appellants next presented Dr. Zoga as a fact and expert witness. N.T., 8/7/18, a.m. session, at 43. During voir dire, Dr. Zoga explained that in 2005-2006 he had worked with colleagues, including Dr. Meyers, to develop an MRI imaging protocol for musculoskeletal groin injuries. *Id.* at 11-12. Further, he studied postoperative MRI cases

and "realized that some of the MRI findings in the postoperative patient that most of us [radiologists] who didn't know any better would think are new injuries actually are expected. They're just a result of the surgery." *Id.* at 24. During Steltz's counsel's cross-examination of Dr. Zoga on voir dire, he elicited testimony from Dr. Zoga regarding Dr. Read's qualifications, specifically that Dr. Read is a musculoskeletal radiologist in Dr. Zoga's division at Thomas Jefferson University, that Dr. Read is a board-certified radiologist who had completed a fellowship in musculoskeletal radiology, and that Dr. Read continues to read MRIs and report on them. *Id.* at 35-37. Further, in response to Steltz's counsel's questioning about Dr. Read's continued employment, Dr. Zoga stated that although he did not have the ability to terminate other employees, he did not believe Dr. Read should be fired for misreading Steltz's June 30th MRI. *Id.* at 35. Dr. Zoga acknowledged that Dr. Read's report regarding the June 30th MRI was still part of the medical record and that no addendum or correction had been issued. *Id.* at 44. Ultimately, the trial court accepted Dr. Zoga as an expert in musculoskeletal radiology. *Id.* at 47.

Appellants' counsel's first line of questioning to Dr. Zoga on direct examination, which follows in its entirety, precipitated this appeal:

> [Appellants' counsel]: Dr. Zoga, how many musculoskeletal radiologists did you say there are in this country?
>
> [Dr. Zoga]: I can only guess based on the membership of the Society of Skeletal Radiology. I did check yesterday. I believe the membership of the Society of Skeletal Radiology, which means radiologists who have to spend at least 50 percent of their clinical effort in the musculoskeletal arena, is about 950. I'm sure there are some others. I don't even know how to guess that.
>
> [Appellants' counsel]: So 950 nationwide that spend about at least 50 percent of their time reviewing musculoskeletal images, that's what you just told us?

[Dr. Zoga]:  That's correct.

[Appellants' counsel]:  So if you were to lump them altogether, those who spend 50 percent of their time and those like Dr. Read who spend only 5 to 10 percent of their time, how many musculoskeletal radiologists do you think there are in this country ballpark?

[Dr. Zoga]:  So if the definition is radiologists who interpret musculoskeletal imaging, it has to be five thousand.

[Appellants' counsel]:  Five thousand.  Five thousand of those radiologists and plaintiff couldn't find one of them to come into this courtroom to support Dr. Read, did you know that?

[Steltz's counsel]:  Your Honor --

[Appellants' counsel]:  Not one, couldn't find one?

[Steltz's counsel]:  Your Honor, I object and I make a motion.

N.T., 8/7/18, a.m. session, at 47-49.

The trial court sustained the objection, and Steltz's counsel requested a curative instruction and made a motion for sanctions. *Id.* at 49. After Steltz's counsel indicated he wanted to make a motion at sidebar, the trial court dismissed the jury from the courtroom. *Id.* Once the jury left the courtroom, Steltz's counsel moved for a mistrial. *Id.* at 50. The trial court denied the motion for a mistrial and recessed for lunch. When the jury returned, the trial court immediately issued the following curative instruction:

> When we were last here, there was an exchange between the counsel and I just wanted to state, as I stated at the beginning of the trial, that the statements and arguments made by counsel do not constitute evidence. They are not the facts. Evidence includes any testimony of witnesses, documents, and other exhibits submitted during the trial constitute facts and I just ask that you understand that particular principle, as you evaluate the evidence, okay.
>
> So the parties or counsel have agreed to proceed in a civil fashion. So we'll continue. Thank you.

N.T., 8/7/18, p.m. session, at 4-5. Steltz did not object to this curative instruction. *Id.*

Dr. Zoga proceeded to testify that the June 27th MRI and the June 30th MRI both showed that the surgical repair was intact, and healing as expected. *Id.* at 10-12, 22 (explaining the June 30th MRI was "completely commensurate with the accepted eight to nine week postoperative repair"). He disagreed with Dr. Read's report that the June 30th MRI showed a complete tear, surmising that Dr. Read "simply misidentified the tissue response to [surgical] adductor decompression as a common adductor tear" due to Dr. Read's lack of familiarity with reading postoperative MRIs. *Id.* at 25-26. Dr. Meyers also testified again as a fact witness, consistent with his prior testimony.

After Appellants rested their case, the trial court permitted Steltz to put on rebuttal evidence, initially limited to testimony, but later expanded to include the demonstrative evidence of Steltz displaying his injured leg to the jury. N.T., 8/10/18, a.m. session, at 40, 52. During his rebuttal, Steltz did not seek to introduce any additional expert testimony.

In his closing statement, Steltz's counsel argued that Dr. Meyers' was negligent both in his "certainty about an injury that was interpreted completely differently" and in his failure to disclose the evidence of a tear to Steltz and his employer, the Chicago Bears organization. N.T., 8/10/18, p.m. session, at 17. In contrast, Appellants' counsel emphasized in his closing statement that Steltz did not present an expert to support Dr. Read's interpretation of the MRI as showing a complete tear and instead the jury "heard from musculoskeletal radiologists that there was no tear and that there was no retraction." *Id.* at 33. Further, Appellants' counsel asserted that Steltz "didn't bring anybody in to dispute [Dr. Crain and Dr. Zoga] because they can't." *Id.* at 36; *see also id.* at 52 (asking "[w]hy wouldn't they come in and hire a radiologist to tell us, yeah, I looked at those images and Dr. Read is correct[?]"). Steltz's counsel did not object to any of these statements. Instead, in rebuttal, Steltz's counsel reiterated that Dr. Read was a board-certified radiologist with a focus in musculoskeletal radiology. *Id.* at 57.

The jury returned a verdict for Appellants. N.T., 8/13/18, a.m. session, at 42-44. Thereafter, Steltz filed a timely post-trial motion asserting that the trial court erred in denying his motion for a mistrial because the effect of Appellants' counsel's question to Dr. Zoga was so prejudicial that no jury instruction could adequately cure the prejudice.

Upon further review of the issue, the trial court agreed with Steltz, concluding "[t]here was no curative instruction this [c]ourt could have delivered to the jury to fix the harm caused by [Appellants'] counsel's egregious statement that not one musculoskeletal radiologist among the 5,000 who practice in the United States could be found to support [Dr. Read's] reading of the MRI." Trial Ct. Op., 12/12/18, at 6-7 (relying on, *inter alia*, *Siegal v. Stefanyszyn*, 718 A.2d 1274 (Pa. Super. 1998)). It further explained that this question was "improper at its core," as follows:

> There was no purpose to [Appellants'] questions to Dr. Zoga but to prejudice the jury. First, [Appellants] knew . . . it would be impossible and wholly improper for Dr. Zoga to answer this leading question in his capacity as an expert witness; it is obvious Dr. Zoga is not privy to . . . [Steltz's] trial preparations. Second, [Appellants] were on notice that [Steltz] had retained [Jaime] Checkoff, M.D. as a musculoskeletal radiology expert because he was listed as a potential expert witness in [Steltz's] pre-trial memorandum . . . and a copy of his report was appended to the same.[3] [Steltz's] counsel also mentioned that he intended to call as a witness 'a radiologist . . . who is a consultant to the [San Francisco] 49ers' in his opening statement,[2] although [Steltz] ended up not calling this witness. Third, the question was a roundabout way to use Dr. Zoga as a prop for counsel to opine on the credibility of [Steltz's] evidence, which neither counsel nor experts are permitted to do. Finally, it was inappropriate for [Appellants']

---

[2] We note that while the trial court attributed this statement to Steltz's counsel, Steltz's counsel's opening statement did not mention any experts in radiology who would testify in support of Dr. Read. N.T., 7/31/18, a.m. session, at 16-31. Instead, it was Appellants' counsel who indicated that he intended to call a radiologist who consulted with the San Francisco 49ers and other teams. *Id.* at 43. This was a reference to Dr. Crain, who testified at trial.

counsel to question a witness about [Steltz's] trial strategy or failure to produce a witness.

> [3] The substance of Dr. Checkoff's report indicates that he had reviewed the same MRIs that Dr. Read had and he concurred with Dr. Read's conclusions.

> * * *

> [Appellants' counsel] had to know he was implying something not really true and practically unverifiable . . . and [the question] was staged perfectly. The odds were good that any such 'question' . . . would be objected to and addressed by the court in dramatic fashion, thus reinforcing [Appellants'] message in the minds of the jurors.

Trial Ct. Op., 12/12/18, at 10-12 (citation omitted). Additionally, the trial court concluded the question was prejudicial as it "had the potential to taint the jury's perceptions of the case by insinuating that no musculoskeletal radiologist out of 5,000 could be found to testify in support of [Dr. Read's] reading of the MRI, which [Appellants] had no right to present as a truth." *Id.* at 12. As such, the trial court granted Steltz's request for a new trial.

The Superior Court affirmed in a divided, unpublished memorandum decision. On appeal, Appellants contended that "the trial court erred in granting a new trial based upon a single unanswered question . . . where the question did not raise an improper subject and it . . . was not so prejudicial that it justified overturning a ten-day jury trial[.]" *Steltz v. Meyers*, 2020 WL 1867021, at *2 (Pa. Super. Apr. 14, 2020). The majority noted the standard that a trial court must follow in deciding a motion for a new trial involves a two-step inquiry, in which a trial court must first determine if it made a mistake, and if so, whether the mistake prejudiced the moving party. *Id.* If the appellate court agrees that a mistake occurred, it must then determine if the trial court abused its discretion in granting a new trial or if the record supports the trial court's reasoning and factual basis. *Id.* (relying on *Ferguson v. Morton*, 84 A.3d 715, 719-20 (Pa. Super. 2013)). When trial counsel's comments are the basis for a new trial, the Superior Court noted that a court must

examine the circumstances of counsel's statements and the precaution the trial court took to avoid prejudice. *Id.* at *3. Although a trial court has a duty to cure the harm, "there are certain instances where the comments of counsel are so offensive or egregious that no curative instruction can adequately obliterate the taint." *Id.* (quoting *Siegal*, 718 A.2d at 1277). Specifically, the court recounted that counsel cannot comment on evidence in an attempt to remove the issue of credibility from the jury, counsel cannot present facts that are not in evidence, and counsel cannot appeal to the jury's passion and prejudice. *Id.*

Applying the two-part standard for a new trial, the Superior Court first concluded Appellants' counsel's question was improper. To reach this conclusion, the Superior Court primarily relied on Appellants' counsel's use of the phrase "couldn't find," which the court reasoned was "quite different from saying Steltz **did not find** another radiologist who would agree with Dr. Read." *Id.* at *5 (emphasis in original). The Superior Court explained that Dr. Read's report was supported by Dr. Checkoff, "a board certified radiologist [who] was listed as a potential expert witness in Steltz's pre-trial memorandum." *Id.* The Superior Court explained that Dr. Checkoff's review of the June 30th MRI concluded that it showed "a partial tear of the right adductor longus muscle[.]" *Id.* (quoting Steltz's Pretrial Memorandum, 2/15/18, at Ex. A, "Jaime Checkoff, MD" letter). Because Appellants' counsel received Steltz's pretrial memorandum with Dr. Checkoff's letter, the court reasoned that Appellants had notice that Steltz actually had found a radiologist who supported Dr. Read's report. *Id.* As Appellants' counsel knew that Steltz had found an expert witness, but nonetheless suggested Steltz could not find one, the Superior Court analogized this case to *Siegel*. *Id.*

In *Siegel*, the trial court granted defendants' motion in limine to preclude plaintiff's medical fact witness from testifying as an expert regarding whether defendant's treatment fell below the standard of care. Yet, during closing argument, defense counsel asked the

jury, "[d]o you think if [plaintiff's medical fact witness] really felt that [defendant] had done something wrong that [plaintiff] would have let him walk out of this court room without saying so? The answer is no." *Siegal*, 718 A.2d at 1276. The *Siegal* Court determined such statement warranted a new trial, as it was "clearly improper," and "conveyed to the jury something that counsel knew to be untrue." *Id.* at 1277. Thus, because the Superior Court concluded the record here similarly supported the trial court's conclusion that Appellants' counsel's statement to Dr. Zoga was improper, in that Appellants' counsel knew his statement to be untrue, the majority determined the trial court did not abuse its discretion in determining that it had erred in denying the motion for a mistrial.

Having concluded a mistake occurred, the Superior Court proceeded to determine that the trial court did not abuse its discretion in finding Steltz was prejudiced by Appellants' counsel's question to Dr. Zoga. The court again noted that Appellants' counsel knew his inclusion of the phrase "couldn't find" was misleading and untrue. It also concluded that Appellants' counsel pursued this line of questioning in an attempt to remove the issue of Dr. Read's credibility from the jury, and counsel was not free to take liberties with or misconstrue the evidence for the jury. *Steltz*, 2020 WL 1867021, at *6 (citing *Ferguson*, 84 A.3d at 723; *Young v. Washington Hosp.*, 761 A.2d 559, 561 (Pa. Super. 2000)). Lastly, the majority determined the curative instruction was inadequate, as it only generally informed the jury that counsel's statements and arguments were not evidence, but did not specifically address the fact that Steltz had found an expert to support Dr. Read's findings. *Id.* (citing *Siegal*, 718 A.2d at 1277 (finding curative instruction was not sufficient to cure harm because it did not convey what was true to the jury)). The majority therefore concluded the trial court did not abuse its discretion in granting Steltz a new trial.

Judge Bowes authored a dissent, recognizing that while the standard of review is deferential, "this case presents that rare circumstance in which the trial court has abused its discretion." *Id.* at *7 (Bowes, J., dissenting). She concluded "the trial court and the [m]ajority . . . mischaracterized the context of the question posed by [Appellants'] counsel and overstated the existence of prejudice." *Id.* First, Judge Bowes disagreed that a mistake occurred at trial because Appellants' counsel's question was not improper. *Id.* at *11. She reasoned that Steltz undisputedly did not present any expert testimony from a musculoskeletal radiologist to corroborate Dr. Read's analysis. *Id.* Thus, Judge Bowes found *Siegal* inapposite, stating "[b]y focusing solely upon the verb utilized by defense counsel to the exclusion of all other substance, the [m]ajority has mischaracterized the basic import of counsel's question . . . . [C]ounsel's statement betrayed no misrepresentation, but drew valid attention to the indisputable fact that [ ] Steltz had not presented expert testimony regarding the correctness of Dr. Read's interpretation[.]" *Id.* Thus, the facts that Steltz did not present an expert to support Dr. Read's reading and there were approximately 5,000 musculoskeletal radiologists potentially available to testify were facts of record within the jury's knowledge. *Id.* at *12. As a result, Judge Bowes concluded the record did not support the factual and legal assessments rendered by the trial court and majority.

Additionally, Judge Bowes opined that the majority failed to view the entirety of the circumstances surrounding the line of questioning, in that immediately prior to Appellants' counsel's question, Steltz's counsel had just "finished attacking Dr. Zoga's credibility, as bolstering Dr. Read's interpretation of the . . . MRI, over numerous sustained objections." *Id.* Thus, under the fair response doctrine, "[c]ounsel's remarks d[id] not constitute reversible error where they [were] 'a reasonable response . . . to trial counsel's attack on

the witness' credibility.'" *Id.* (quoting *Commonwealth v. Hanible*, 30 A.3d 426, 470 (Pa. 2011)).

Although her conclusion that the question was not inappropriate would end her analysis, she proceeded to address the majority's analysis of the prejudice prong. *Id.* Judge Bowes concluded the majority's finding of prejudice was not supported by the record because such finding heavily relied on the majority's "presumption that defense counsel somehow took 'liberties' with the facts." *Id.* at *13 (citing, *inter alia, Ferguson*, 84 A.3d at 723; *Young*, 761 A.2d at 561). She further emphasized that the single question did not undermine the confidence in the trial as a whole because (1) counsel's question did not remove the issue of Dr. Read's credibility from the jury, in that Steltz's counsel first raised the issue of Dr. Read's credibility when cross-examining Dr. Zoga about his qualifications as an expert; and (2) the curative jury instruction sufficiently mitigated any potential prejudice because it directed the jury to "disregard the contents of defense counsel's question." *Id.* at *17 (citing, *inter alia*, *Ferguson*, 84 A.3d at 725 (explaining jury is presumed to obey court's instruction)). Thus, Judge Bowes concluded the trial court abused its discretion in granting a new trial.

## II. ISSUE AND STANDARD OF REVIEW

This Court granted Appellants' petition for allowance of appeal to address the following issue:

> Whether the Superior Court misapplied and fundamentally altered Pennsylvania's settled standard for prejudice caused by statements or questions of trial counsel, which forbids a new trial on a record like this, where defense counsel's question was based on the record, the trial court issued a curative instruction, the jury was repeatedly instructed that statements and questions of counsel are not evidence, and the closing arguments of both counsel fully addressed the subject matter of defense counsel's question?

*Steltz v. Meyers*, 249 A.3d 887 (Pa. 2021) (per curiam).

This Court's standard of review over a trial court's decision to grant or deny a new trial is whether the trial court abused its discretion. *Harman ex rel. Harman v. Borah*, 756 A.2d 1116, 1122 (Pa. 2000). We engage in the same two-step analysis as the trial court: first determining whether a mistake occurred and, if so, whether the trial court erred in ruling on the request for a new trial. *Id.* at 1123. Our scope of review over the first prong is governed by the trial court's rationale. *Id.* at 1122. If the trial court identifies the specific mistake or mistakes, our review is limited to its stated reason. *Id.* at 1123. Further, if the mistake involved a discretionary act, we review for an abuse of discretion; however, if it involved an error of law, we review for legal error. *Id.* "If there were no mistakes at trial, the appellate court must reverse a decision by the trial court to grant a new trial because the trial court cannot order a new trial where no error of law or abuse of discretion occurred." *Id.* If an appellate court agrees that a mistake occurred, it proceeds to the second step and must determine whether the trial court abused its discretion in ruling on the motion for a new trial. *Id.*

### III. WHETHER A MISTAKE OCCURRED AT TRIAL

As our standard of review dictates, we proceed to apply the two-prong analysis to determine whether the trial court erred in granting a new trial, first determining whether a mistake occurred at trial. The parties disagree about whether a mistake occurred. We note that our review is confined to the single mistake the trial court identified as the basis for its decision to grant a new trial, which was that it mistakenly denied Steltz's motion for a mistrial based on Appellants' counsel's improper question. *See* Trial Ct. Pa.R.A.P. 1925(a) Op., 3/4/19, at 4 (clarifying "[w]e wish to take this opportunity to disabuse [Appellants] of the notion that we might have relied on misconduct other than [Appellants']

counsel's improper question to Dr. Zoga in granting a new trial."); *Harman*, 756 A.2d at 1123. Further, because the trial court's denial of a mistrial was a discretionary act, we review for an abuse of discretion. *Harman*, 756 A.2d at 1123; *Commonwealth v. Rega*, 933 A.2d 997, 1016 (Pa. 2017) ("the grant or denial of a mistrial will not be overturned absent an abuse of discretion."). Accordingly, we set forth the parties' arguments on this issue.

## A. PARTIES' ARGUMENTS

Appellants assert the question posed to Dr. Zoga was not improper. While acknowledging that the question was "certainly grounded in advocacy," they argue that it did not misconstrue the evidence. Appellants' Brief at 22. Holistically viewing the question, which asked whether Dr. Zoga was aware that Steltz could not find an expert to come into court to support Dr. Read, Appellants contend that "Dr. Zoga, the jury, and everyone else knew as an absolute fact that [Steltz] had rested his case without calling any radiology expert to support Dr. Read." *Id.* at 23. Appellants criticize the Superior Court for focusing on the verb counsel chose and argue that the question did not insinuate that Steltz was generally unable to find or retain any radiologist to support Dr. Read. *Id.* at 23-24. Instead, Appellants insist the question was limited to what had occurred at trial in the courtroom. *Id.* at 24. Further, due to the question's inherent focus on courtroom activity, Appellants contend that Steltz's pretrial memorandum and Dr. Checkoff's report are irrelevant. *Id.* (arguing Dr. Checkoff's report was inadmissible hearsay).

Additionally, Appellants distinguish *Siegal*. Appellants maintain counsel did not make an untruthful statement but asked a question after establishing the predicate facts that 5,000 radiologists in the United States specialize in reading musculoskeletal MRIs, and Steltz did not find one to testify at trial. *Id.* at 25. Appellants also note that the trial court did not preclude Dr. Checkoff's testimony, but "it was [Steltz's] own choice not to

call Dr. Checkoff or any other radiology expert in his case[-]in[-]chief, and the trial court specifically permitted him to present rebuttal evidence, yet he still failed to call such an expert." *Id.* As such, Appellants stress that the question to Dr. Zoga "was a proper effort to elicit criticism of a glaring deficiency in [Steltz's] case, not an effort to remove Dr. Read's credibility from the jury." *Id.* at 26; *see also id.* at 27 (noting that parties are generally permitted to criticize each other for failing to call expert witnesses and citing *Wilson v. Consol. Dressed Beef Co.*, 145 A. 81, 85 (Pa. 1929), and *Nazarak v. Waite*, 216 A.3d 1093, 1112-13 (Pa. Super. 2019)).

Moreover, Appellants argue that even if the question was improper in isolation, it was a fair response to Steltz's perceived attack on Appellants' experts. Appellants' Brief at 28. Appellants contend that during the voir dire of Dr. Crain, "[Steltz's] counsel belittled musculoskeletal radiology as a 'self declare[d]' specialty that has no board certification and can be practiced by any of the thousands of radiologists who 'think' they are qualified to read musculoskeletal imaging." *Id.* Appellants claim that a fair response to that line of questioning was to ask whether any of those thousands of radiologists had testified in support of Dr. Read. *Id.* Appellants conclude that the trial court's initial decision to deny a mistrial was not a mistake, and we should reverse the subsequent decision to grant a new trial. *Id.* at 31.

In contrast, Steltz argues Appellants' counsel's question to Dr. Zoga was not merely acceptable legal advocacy because "[i]t went far beyond the record, and incorporated various misleading, even untrue[,] insinuations[.]" Steltz's Brief at 23. Steltz maintains that the wording of the question implied that "Steltz had asked 5,000 radiologists (or a large number of them) to serve as an expert witness; that none of them were willing to testify in support of Dr. Read's case-important MRI interpretations; and that Steltz had hidden this fact from the jury." *Id.* Further, Steltz maintains that the only

purpose of the question was to prejudice the jury because Dr. Zoga could not have had the requisite knowledge to answer the question. *Id.* at 24. The insinuation that Steltz could not find an expert to support Dr. Read was untrue, according to Steltz, because his pretrial memorandum identified Dr. Checkoff as an expert who would testify at trial to support Dr. Read. *Id.*; *see also id.* at 28-29 (contending Dr. Checkoff's report was not inadmissible hearsay because it was not offered for the truth of its contents but to show Appellants had notice of an expert). As such, Steltz asserts that the question was not based on record evidence and purposely misleading, and its only purpose was to prejudice the jury. *Id.* at 25-26.

In support of his position, Steltz discusses *Rice v. Hill*, 172 A. 289 (Pa. 1934), a personal injury case in which the plaintiff's counsel stated that "[the defendants] had a doctor in court and they didn't call him to dispute [the testimony of the plaintiff's treating physician]." *Rice*, 172 A. at 290. This statement was false because the record did not show that the defendants had any doctor in court or that any doctor had examined the plaintiff and prepared an expert opinion. *Id.* Steltz analogizes this case to *Rice* and *Siegal*, on the basis that Appellants' counsel knew the question and its insinuations were untrue and misleading but still pursued the question.

As an additional reason that the question was improper, Steltz argues it opined negatively on Dr. Read's credibility, as the trial court and Superior Court concluded. Steltz's Brief at 30. Because deciding witness credibility is exclusively the jury's function, Steltz maintains the question posed to Dr. Zoga was improper because it sought to elicit expert testimony on the credibility of another witness. *Id.* at 31 (citing *Commonwealth v. Maconeghy*, 171 A.3d 707, 712 (Pa. 2017) (stating that expert witnesses cannot comment on witness credibility)). Accordingly, Steltz requests that we affirm the Superior Court.

In their reply brief, Appellants emphasize that Steltz did not refute their argument that the question was a fair response to Steltz's counsel's attacks on the specialty of musculoskeletal radiology and on the credibility of Appellants' experts. Appellants' Reply Brief at 1-2. Appellants also maintain that the question did not contain any of the "insinuations" that Steltz attributed to the question because it did not suggest Steltz had contacted any radiologists, had found or identified an expert, or had hid that from the jury. *Id.* at 4. Instead, "[Appellants'] counsel's question emphasized the notable fact that none of the musculoskeletal radiologists whom [Steltz's] counsel had demeaned as 'self-declared' came into the courtroom to testify in support of Dr. Read." *Id.* at 5.

Additionally, Appellants claim *Rice* undermines Steltz's position because the attorney in *Rice* made a false statement that an expert was in the courtroom and the defendant did not call him, but Appellants did not make a false statement by noting that no radiology expert testified to support Dr. Read. *Id.* at 6. Appellants continue that the deceptive conduct in the cases upon which Steltz relies "is nothing like saying 'couldn't find' rather than 'did not find,' which is the sole basis on which the Superior Court affirmed the award of a new trial." *Id.* at 7.

Moreover, Appellants maintain that the question to Dr. Zoga was "certainly intended to highlight the lack of expert support for Dr. Read's interpretation of the MRI, but it was not prohibited commentary on Dr. Read's credibility." *Id.* at 8. Instead, Appellants claim the question addressed the lack of evidence, which is distinct from attacking a witness's credibility. *Id.* Because the question did not ask Dr. Zoga to comment on whether Dr. Read was truthful, Appellants contend it did not suggest that Dr. Zoga comment on Dr. Read's credibility. *Id.* Instead, the question asked Dr. Zoga "to comment on the lack of support for Dr. Read's interpretation." *Id.* at 9.

## B. ANALYSIS

To constitute a "mistake," the trial court's denial of Appellants' motion for mistrial must have been an abuse of its discretion. "An abuse of discretion is not merely an error of judgment[.]" *Paden v. Baker Concrete Const., Inc.*, 658 A.2d 341, 343 (Pa. 1995) (*quoting In re Milton Hershey Med. Ctr.*, 634 A.2d 159, 161 (Pa 1993)). An abuse of discretion exists when the trial court has rendered a judgment that is manifestly unreasonable, arbitrary, or capricious, has failed to apply the law, or was motivated by partiality, prejudice, bias, or ill will." *Harman*, 756 A.2d at 1123. "Whether a court abuses its discretion in [denying a motion for a mistrial] because of improper remarks of counsel must be determined by the circumstances under which the statement was made and by the precautions taken by the court and counsel to prevent its having a prejudicial effect[.]" *Martin v. Phila. Suburban Transp. Co.*, 257 A.2d 535, 537 (Pa. 1969) (quoting *McCune v. Leamer*, 119 A.2d 89, 90 (Pa. 1956)). It is well settled that juries are presumed to follow the trial court's instructions, including its curative instructions following an improper question. *See Commonwealth v. Simpson*, 754 A.2d 1264, 1272 (Pa. 2000). "Generally, in the absence of extraordinary circumstances, a prompt and effective curative instruction which is directed to the damage done will suffice to cure any prejudice suffered by the complaining party." *Mount Olivet Tabernacle Church v. Edwin L. Wiegand Division*, 781 A.2d 1263, 1275 (Pa. Super. 2001) (internal quotation marks omitted), *aff'd per curiam*, 811 A.2d 565 (Pa. 2002).

Initially, we recount the circumstances under which Appellants' counsel asked the question to Dr. Zoga at issue. At that point, Steltz had rested his case-in-chief without presenting an expert in radiology to verify Dr. Read's interpretation of the June 30th MRI. Further, the jury had heard: (1) the testimony of Appellants' first expert witness, Dr. Crain, an expert in radiology, that Dr. Read's report was incorrect based on her review of the June 30th MRI; (2) Steltz's counsel's attempt, during the cross examination of the voir dire of Dr. Crain, to establish that musculoskeletal radiology was essentially a "self-

declared" subspecialty and inquire as to the number of radiologists who interpret musculoskeletal MRIs, a question Dr. Crain was unable the answer; and (3) the voir dire of Dr. Zoga, a portion of which included Steltz's counsel reinforcing Dr. Read's credentials. Immediately after Dr. Zoga was certified as an expert witness, Appellants' counsel elicited testimony from Dr. Zoga that he knew there were approximately 5,000 radiologists in the country who interpreted musculoskeletal MRIs, to which Steltz's counsel did not object. It was at this time, with the foregoing foundations, that Appellants' counsel asked the question "Five thousand. Five thousand of those radiologists and [Steltz] couldn't find one of them to come into this courtroom to support Dr. Read, did you know that?" N.T., 8/7/18, a.m. session, at 48. Dr. Zoga never answered this question. *Id.* at 48-49.[3] After dismissing the jury, denying Steltz's motion for a mistrial, and recessing for lunch, the trial court immediately issued a curative instruction referring to the "exchange between the counsel" and cautioning the jury that "the statements and arguments made by counsel do not constitute evidence," to which Steltz did not object. N.T., 8/7/18, p.m. session, at 4-5.

The trial court and Superior Court did not consider these circumstances and instead focused solely on the wording of the question, the objection to which had been sustained. Moreover, the trial court and the Superior Court mischaracterized Appellants' counsel's question to Dr. Zoga as suggesting Steltz could not find any radiology expert to support Dr. Read. Viewed as a whole, Appellants' counsel's question focused on Steltz's failure to present a radiology expert at trial to testify in support of Dr. Read. Thus, whether Steltz had obtained an expert report or listed an expert as a potential witness in his pretrial

---

[3] The trial court, as noted, sustained an objection to the question. That the question was objectionable in some aspects of its phrasing and relevance to the expertise of evidence provided by the witness being addressed is not at issue. Rather it is the subsequent motion for mistrial based on the question's suggestion of a lack of expert evidence presented in Steltz's case-in-chief that formed the basis for the motion for a new trial.

memorandum was outside the scope of the question Appellants' counsel asked. Appellants' counsel was not commenting on Steltz's pretrial preparations or misrepresenting the fact that Steltz had notified Appellants he might present expert testimony in support of Dr. Read. Instead, Appellants' counsel's question attempted to highlight the fact that Steltz did not ultimately present such expert testimony, regardless of whether he had retained an expert in preparation for trial.

Because the question did not attempt to convey something that was untrue, the Superior Court's reliance on *Siegal* was misplaced. As discussed above, the attorney in *Siegal* commented on the lack of an expert opinion from a medical fact witness who the trial court had precluded from testifying as an expert. *Siegal*, 718 A.2d at 1276. The attorney's commentary was improper because it conveyed something to the jury that the attorney knew was untrue. *Id.* at 1277. However, in this case, Appellants' counsel did not convey any untrue facts to the jury. The fact that Steltz did not present a radiology expert to testify at trial in support of Dr. Read was not untrue at the time Appellants' counsel asked the question. Steltz had not attempted to qualify Dr. Read as an expert witness nor had Steltz presented a radiology expert to testify in support of Dr. Read. Further, the trial court had not precluded Steltz from presenting Dr. Checkoff as an expert. Accordingly, *Siegal* does not support the Superior Court's conclusion that the question was improper.

The record supports the trial court's initial decision to deny Steltz's motion for a mistrial. At that point in the case, the question to Dr. Zoga was a single reference to Steltz's failure to produce an expert in radiology at trial to support Dr. Read, the trial court sustained Steltz's objection to the question, Dr. Zoga did not answer the question, the trial court issued a curative instruction at the next opportunity, and Appellants' counsel did not continue to pursue this subject in his direct examination of Dr. Zoga. Further, as

Judge Bowes explained in her dissent, counsel's question was not improper because it was "duly predicated upon: (1) the lack of expert radiology testimony presented by [ ] Steltz; and (2) Dr. Zoga's testimony that there were approximately 5,000 musculoskeletal radiologists potentially available for such consultations. Both of these facts were of-record." *Steltz*, 2020 WL 1867021, at *11 (Bowes, J., dissenting). Under these circumstances, and considering the precautions taken by the trial court and the parties, we conclude the trial court did not abuse its discretion in denying the motion for a mistrial. *See Martin*, 257 A.2d at 537; *see also Commonwealth v. Jones*, 683 A.2d 1181, 1195 (Pa. 1996) (stating an "isolated reference [to irrelevant evidence], to which there was a curative instruction provided, would not have presented any basis for the granting of a mistrial."). Because this was the only basis the trial court specified as grounds for a new trial, we must reverse because the trial court cannot order a new trial in the absence of a mistake. *See Harman*, 756 A.2d at 1123.

There may be certain circumstances in which a trial court may deny a motion for a mistrial because it concluded its curative instruction was adequate, but still properly grant a new trial based on the cumulative effect of the improper remarks. *See Lee v. Se. Pa. Transp. Auth.*, 704 A.2d 180, 183 (Pa. Cmwlth. 1997). However, the trial court in this case did not view the question in the context of the entire two-week trial when evaluating the post-trial motions. In addition to the circumstances in which the question was presented, as discussed above, we note several other factors that weigh against granting a new trial. First, after the defense rested its case, the trial court permitted Steltz to present rebuttal evidence. However, despite knowing that his case had been attacked for the failure to present an expert in support of Dr. Read, Steltz chose not to move to have Dr. Read certified as an expert or to present expert testimony in support of Dr. Read's interpretation. Second, in Appellants' counsel's closing statement, he predictably

argued that he presented musculoskeletal radiologists, Steltz did not present any witnesses to dispute those experts, and the reason Steltz "didn't bring anybody in to dispute this [is] because they can't." N.T., 8/10/18, p.m. session, at 36. Steltz did not object to these arguments. Instead, in rebuttal, Steltz's counsel defended his trial strategy and stated that he was relying solely on Dr. Read, a board-certified radiologist with a fellowship in musculoskeletal radiology. *Id.* at 57-58. Third, the trial court again charged the jury that "[e]vidence is not what the lawyers say." N.T., 8/13/18, a.m. session, at 13. Based on these considerations, we conclude it was an abuse of discretion for the trial court to grant a new trial in the absence of a mistake.

Because we have concluded that a mistake did not occur, we reverse the order of the Superior Court and remand for further proceedings.

Order reversed. Case remanded. Jurisdiction relinquished.

Justices Saylor, Todd and Dougherty join the opinion.

Justice Wecht files a dissenting opinion in which Chief Justice Baer and Justice Donohue join.